Slip Op. 19-170

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| VENUS WIRE INDUSTRIES PVT. LTD., ET AL., | |
| Plaintiffs, | |
| v. | Before: Mark A. Barnett, Judge |
| UNITED STATES, | Court No. 18-00113 |
| Defendant, | |
| and | |
| CARPENTER TECHNOLOGY CORPORATION, ET AL., | |
| Defendant-Intervenors. | |

## <u>OPINION AND ORDER</u>

[Remanding the U.S. Department of Commerce's Final Results in the Changed Circumstances Review of the Antidumping Duty Order on Stainless Steel Bar from India.]

Dated: December 20, 2019

<u>Eric C. Emerson</u>, Steptoe & Johnson LLP, of Washington, DC, argued for Plaintiffs. With him on the brief was <u>St. Lutheran M. Tillman</u>.

<u>Kara M. Westercamp</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With her on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Tara Hogan</u>, Assistant Director.  Of counsel on the brief was <u>Emma T. Hunter</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Grace W. Kim</u>, Kelley Drye & Warren LLP, of Washington, DC, argued for Defendant-Intervenors.  With her on the brief was <u>Laurence J. Lasoff</u>.

Barnett, Judge: Plaintiffs, Venus Wire Industries Pvt. Ltd. and its affiliates

Precision Metals, Sieves Manufacturers (India) Pvt. Ltd., and Hindustan Inox Ltd.

(collectively, "Venus"), challenge the U.S. Department of Commerce's ("Commerce" or

"the agency") final results in the changed circumstances review of the antidumping duty

order on stainless steel bar from India.  *See* Compl., ECF No. 9; *Stainless Steel Bar*

*From India*, 83 Fed. Reg. 17,529 (Dep't Commerce Apr. 20, 2018) (final results of

changed circumstances review and reinstatement of certain companies in the

antidumping duty order) ("*Final Results*"), ECF No. 20-5, and accompanying Issues and

Decision Mem., A-533-810 (Apr. 16, 2018) ("I&D Mem."), ECF No. 20-6.[1]

Venus challenges two aspects of the *Final Results*.  Venus first contests

Commerce's determination that Venus is not the producer of subject merchandise made

using inputs that are covered by the scope of the underlying antidumping duty order and

the corresponding determination that the producers are the unaffiliated suppliers of the

inputs.  Confidential Pls.' Rule 56.2 Mot. For J. Upon the Agency R., ECF No. 33, and

Confidential Venus Wire Indus. Pvt. Ltd. and its Affiliates Precision Metals, Sieves Mfrs.

(India) Pvt. Ltd., and Hindustan Inox Ltd.'s Mem. of P&A in Supp. of their Mot. For J. on

the Agency R. ("Pls.' Mem.") at 8–15, ECF No. 33.  Venus also contests Commerce's

---

[1] The administrative record for this case is divided into a Public Administrative Record ("PR"), ECF No. 20-2, and a Confidential Administrative Record ("CR"), ECF Nos. 20-3, 20-4.  Parties submitted joint appendices containing record documents cited in their briefs.  *See* Public J.A. ("PJA"), ECF No. 50; Confidential J.A. ("CJA"), ECF No. 46. Parties submitted a supplemental confidential joint appendix containing additional record documents pursuant to the court's request.  *See* Confidential Joint Submission of R. Documents ("Suppl. CJA"), ECF No. 53.  The court references the confidential version of the relevant record documents, unless otherwise specified.

decision to use total facts otherwise available with an adverse inference (referred to as "total adverse facts available" or "total AFA") to determine Venus's rate.  *See id.* at 16–28.

Defendant United States ("the Government") and Defendant-Intervenors[2] defend the *Final Results*.  *See generally* Confidential Def.'s Resp. to Pls.' Mots. For J. Upon the Agency R. ("Def.'s Resp."), ECF No. 39; Confidential Def.-Ints.' Resp. in Opp'n to Pls.' Mot. For J. on the Agency R. ("Def.-Ints.' Resp."), ECF No. 42.

For the following reasons, the court remands Commerce's determination that Venus is not the producer of the subject merchandise and defers consideration of arguments regarding the agency's use of total AFA pending Commerce's redetermination on remand.

## BACKGROUND

Commerce published the antidumping duty order on stainless steel bar ("SSB" or "SS bar") from India on February 21, 1995.  *See Stainless Steel Bar from Brazil, India and Japan*, 60 Fed. Reg. 9,661 (Dep't Commerce Feb. 21, 1995) (antidumping duty orders) ("*SS Bar Order*").[3]  On September 13, 2011, Commerce conditionally revoked

---

[2] Defendant-Intervenors consist of Carpenter Technology Corporation; Crucible Industries LLC; Electralloy, a Division of G.O. Carlson, Inc.; North American Stainless; Outokumpu Stainless Bar, LLC; Universal Stainless & Alloy Products, Inc.; and Valbruna Slater Stainless, Inc. (collectively, "Defendant-Intervenors" or, when in reference to the underlying proceeding, "Petitioners").

[3] The SS bar covered by the scope of the *SS Bar Order* consists of
        articles of stainless steel in straight lengths that have been either hot-
        rolled, forged, turned, cold-drawn, cold-rolled or otherwise cold-finished, or
        ground, having a uniform solid cross section along their whole length in
        the shape of circles, segments of circles, ovals, rectangles (including

the *SS Bar Order* with respect to subject merchandise produced or exported by Venus.

*See Stainless Steel Bar from India*, 76 Fed. Reg. 56,401, 56,402-03 (Dep't Commerce

Sept. 13, 2011) (final results of the antidumping duty admin. review, and revocation of

the order, in part) ("*Revocation Finding*").[4]

On September 29, 2016, Petitioners submitted a request for a "changed

circumstances" review of Venus and Viraj Profiles Ltd. on the basis that they had

resumed selling SS bar in the United States at less than fair value. Pet'rs' Req. for

Changed Circumstances Reviews (Sept. 29, 2016) at 1, 5, CR 1, PR 1, CJA Tab 1.[5]  On

December 16, 2016, Commerce initiated a changed circumstances review for such

_____

squares), triangles, hexagons, octagons or other convex polygons.  SSB
includes cold-finished SSBs that are turned or ground in straight lengths,
whether produced from hot-rolled bar or from straightened and cut rod or
wire, and reinforcing bars that have indentations, ribs, grooves, or other
deformations produced during the rolling process.

*SS Bar Order*, 60 Fed. Reg. at 9,661.

[4] Commerce's authority to revoke an order is grounded in 19 U.S.C. § 1675.  By its
terms, Commerce "may revoke, in whole or in part, . . . an antidumping duty order" upon
completion of a periodic or changed circumstances review.  19 U.S.C. § 1675(d)(1).
Pursuant to the regulation in effect at the time of revocation, Commerce could revoke an
order in part when it finds that (A) an exporter or producer has "sold the merchandise at
not less than normal value for a period of at least three consecutive years"; (B) the
exporter or producer has agreed in writing to immediate reinstatement of the order if
Commerce determines that, subsequent to revocation, the exporter or producer sells
subject merchandise at less than fair value; and (C) continued application of the order is
unnecessary to offset dumping.  19 C.F.R. § 351.222(b)(2)(i) (2011).  Commerce
determined that Venus met each of these requirements.  *Revocation Finding*, 76 Fed.
Reg. at 56,403.

[5] Commerce conducts a changed circumstances review of an antidumping duty order
when it "receives information concerning, or a request from an interested party for a
review of" the "final affirmative determination" underlying the order that "shows changed
circumstances sufficient to warrant a review."  19 U.S.C. § 1675(b)(1)(A); *see also* 19
C.F.R. 351.216 (2019).

purpose.  *See Stainless Steel Bar From India*, 81 Fed. Reg. 91,118 (Dep't Commerce

Dec. 16, 2016) (initiation of antidumping duty changed circumstances review).

       Venus responded to several questionnaires during the review.  In section A of

Commerce's initial questionnaire, the agency requested Venus to describe the materials

used in the production of subject merchandise.  Questionnaire to Venus (Sec. A) (Dec.

14, 2016) at A-12, PR 48, CJA Tab 5.  Venus responded that it uses "Stainless Steel

Black Bars (round/hex/square) or Stainless Steel Rods in Coil Form."  Submission of

Resp. to Sec. A of the Questionnaire in Changed Circumstances Review (Jan. 30,

2017) ("Venus AQR") at A-24, CR 22, PR 65, CJA Tab. 6.  In a separate chart, Venus

stated that its production begins with "S.S. Wire Rods" or "S.S. Rounds - Hot Rolled."

Venus AQR, Annex. A-8, Suppl. CJA at ECF p. 138.

       In subsequent questionnaire responses, Venus referred to its inputs of SS black

bar as SS rounds, straight rounds, or hot rolled bar.  *See* I&D Mem. at 9 & n.26 (citation

omitted); Venus Group Annex. SQR-27 (March 30, 2017), CR 105, PR 144, CJA Tab

10; Venus Group Annex. SQR-28 (March 30, 2017), CR 106, PR 145, CJA Tab 11;

Venus Group's Resp. to Sec. B & C Suppl. Questionnaire (Apr. 3, 2017), Annex. D-2,

CR 132, PR 173, Suppl. CJA at ECF pp. 212–19; Resp. to Sec. D of the Questionnaire

(May 18, 2017) ("Venus 2nd Suppl. DQR") at 7, 13, Annex. DR-1, DR-2, CR 201, PR

260, Suppl. CJA at ECF pp. 254–82.

       Supplier invoices appended to Venus's second supplemental questionnaire

response alerted Commerce to the possibility that one of Venus's inputs might be

subject merchandise; thus, the agency requested further information.  I&D Mem. at 10 &

n.29 (citing Venus 2nd Suppl. DQR, Annex. SQR-85, CR 207, PR 266, Suppl. CJA at

ECF pp. 304–24); Resp. to SQR3-Questionnaire (July 10, 2017) ("Venus 3rd Suppl.

DQR") at Question 15, CR 250, PR 308, CJA Tab 15.  Venus reported that one of its

inputs, "Stainless Steel Hot Rolled Bars (termed as SS rounds)" is "included in the

scope of the [*SS Bar Order*]."  Venus 3rd Suppl. DQR at Question 15.  Venus also

described the processing it performs to convert the inputs into "Cold Finished Stainless

Steel Bright Bars."  *Id.*

Commerce preliminarily determined to reinstate Venus in the *SS Bar Order*

based on the agency's finding that Venus sold subject merchandise at less than fair

value.  Decision Mem. for the Prelim. Results of the Antidumping Duty Changed

Circumstances Review of Stainless Steel Bar from India (Oct. 12, 2017) at 1, PR 377,

CJA Tab 19.  Commerce further determined that Venus is not the producer of the

subject merchandise and, in the absence of cost information from Venus's suppliers,

assigned Venus a margin based on total AFA.  *Id.* at 5, 7.

Thereafter, Commerce issued Venus a fourth supplemental questionnaire in

which it requested Venus to "obtain the actual costs of production" from its suppliers of

SS rounds used to make SS bar.  Req. for Extension to 4th Suppl. Resp. (Nov. 14,

2017) at 1, CR 318–19, PR 398, CJA Tab 24.  Venus reported its "significant efforts to

obtain the cost of the stainless steel rounds purchased from unaffiliated suppliers during

the [period of review]."  *Id.*  Those efforts included personal visits to several suppliers

and emails "cautioning [the suppliers] of cessation of future business" if they refused to

provide cost information.  *Id.* at 3; *see also id.* at Ex. 1 (documenting Venus's efforts).

Court No. 18-00113                                                    Page 7

Despite these efforts, only one of Venus's suppliers submitted its cost information to

Commerce.  *Id.* at 1–2.

On April 20, 2018, Commerce published the *Final Results*.  Commerce continued

to find that Venus is not the producer of subject merchandise manufactured from SS

rounds.  I&D Mem. at 11–14.  Commerce did, however, conclude that Venus produced

the subject merchandise manufactured from SS wire rod.  Final Results Analysis Mem.

for Venus Wire Indus. Pvt. Ltd. and its Affiliates Precision Metals, Sieves Mfrs. (India)

Pvt. Ltd., and Hindustan Inox Ltd. (Apr. 16, 2018) ("Final Analysis Mem.") at 4, CR 327,

PR 424, CJA Tab 32.  Commerce reinstated Venus in the *SS Bar Order* and assigned

Venus a weighted-average dumping margin of 30.92 percent based on the use of total

AFA.  *Final Results*, 83 Fed. Reg. at 17,530; *see also* I&D Mem. at 14–17; Final

Analysis Mem. at 1–3.[6]

Venus timely commenced this action on May 18, 2018.  *See* Summons, ECF No.

1.  Venus's motion is fully briefed, and the court heard oral argument on September 10,

2019.  Docket Entry, ECF No. 56.

---

[6] Commerce also reinstated Viraj Profiles Ltd. ("Viraj") in the *SS Bar Order* and used
total AFA to determine its margin.  *Final Results*, 83 Fed. Reg. at 17,530.  Those
determinations as to Viraj are not at issue here.

Court No. 18-00113                                                                 Page 8

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[7] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45 (1984), guides judicial review of Commerce's interpretation and implementation of the antidumping and countervailing duty statutes.  *See Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1344 (Fed. Cir. 2017); *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379–82 (Fed. Cir. 2001) (affording *Chevron* deference to agency methodology in furtherance of its statutory interpretations).  First, the court must determine "whether Congress has directly spoken to the precise question at issue."  *Apex Frozen Foods*, 862 F.3d at 1344 (quoting *Chevron*, 467 U.S. at 842).  If Congress's intent is clear, "that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress."  *Id.* (quoting *Chevron*, 467 U.S. at 842–43).  However, "if

---

[7] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are generally to the 2012 edition unless stated otherwise.

the statute is silent or ambiguous," the court must determine whether the agency's

action "is based on a permissible construction of the statute."  *Id.* (quoting *Chevron*, 467

U.S. at 843).

DISCUSSION

## I.  Commerce's Determination that Venus is Not the Producer of Subject Merchandise Venus Exported to the United States

An antidumping duty is the amount by which the normal value of a product—

generally, its price in the exporting country—exceeds the export price, as adjusted.  19

U.S.C. § 1673; *see also id.* § 1677b(a)(1)(B)(i) (defining normal value).  In certain

situations, Commerce calculates normal value using the constructed value of the

merchandise.  *Id.* § 1677b(a)(4).  Constructed value is the sum of (1) "the cost of

materials and fabrication or other processing of any kind employed in producing the

merchandise"; (2) actual "selling, general, and administrative expenses" and profits; and

(3) "the cost of all containers and coverings . . . and all other expenses incidental to"

preparing the subject merchandise "for shipment to the Unites States."  *Id.*

§ 1677b(e)(1), (2)(A), (3).

To ascertain constructed value, Commerce typically requires information from

both the producer and the exporter of the subject merchandise.  *See id.* § 1677(28);

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No.

103–316, vol.1, at 835 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4172 ("SAA")[8]

("[When] different firms perform the production and selling functions, Commerce may

---

[8] The SAA is the authoritative interpretation of the statute. 19 U.S.C. § 3512(d); *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1345 n.7 (Fed. Cir. 2002).

include the costs, expenses, and profits of each firm in calculating cost of production

and constructed value.").  Consequently, Commerce must identify the producer of the

subject merchandise in order to obtain the information necessary to calculate the cost of

production and constructed value.  I&D Mem. at 11.  If Commerce properly concluded

that Venus was not the producer of the subject merchandise, then Commerce properly

required Venus to provide the production costs of its suppliers for the determination of

normal value.  Otherwise, if Venus should have been regarded as the producer, cost

information from Venus's suppliers would not be necessary.

      In the underlying proceeding, Commerce applied a test for identifying the

producer of the subject merchandise that it first used in its investigation of narrow

woven ribbon with woven selvedge from Taiwan.  I&D Mem. at 11 & n.35 (citing *Narrow

Woven Ribbons with Woven Selvedge from Taiwan*, 75 Fed. Reg. 41,804 (Dep't

Commerce July 19, 2010) ("*NWR*"), and Issues and Decision Mem. for the Antidumping

Duty Investigation of Narrow Woven Ribbon with Woven Selvedge from Taiwan, A-583-

844 (undated) ("NWR Decision Mem.") at 48–49, *available at* https://enforcement.trade.

gov/frn/summary/taiwan/2010-17538-1.pdf (last visited Dec. 20, 2019)).  In *NWR*,

Commerce considered the extent to which the exporter "further manufactured" griege

ribbon, a type of in-scope merchandise used to produce subject narrow woven ribbon.

NWR Decision Mem. at 48.  To ascertain the degree of further manufacturing,

Commerce considered "whether raw materials were added, and whether further

processing was performed that changed the physical nature and characteristics of the

product."  *Id.* at 48.  Commerce concluded that "minimal" additional materials were used

in the manufacturing process.  *Id.* at 49.  Commerce further noted that 10 out of the

agency's 16 essential characteristics for narrow woven ribbon were "created" by the

producer of the input greige ribbon.  *Id.*  Thus, "based on the totality of the record

evidence and the facts specific to [that] case," Commerce determined that the greige

ribbon weavers were the producers.  *Id.*

      Commerce applied the same type of analysis here to assess whether Venus is

the producer of SS bar made from in-scope SS rounds.  I&D Mem. at 12–13.

Commerce identified the six "essential physical characteristics" of SS bar as grade,

remelting, shape, finish, type of final finishing operation, and size.  *Id.* at 12.  Commerce

then explained that because Venus's processing "does not affect three of the six

essential physical characteristics" of the subject merchandise—"grade, remelting, and

shape"—and does not require the addition of new materials, Commerce did not find

Venus to be the producer of the subject merchandise.  *Id.* at 12–13.

      In reaching this conclusion, Commerce dismissed Venus's argument regarding

the relevance of Commerce's treatment of Venus as the producer in eight prior reviews,

stating that "each segment of a proceeding has its own record and stands on its own,"

and the issue does not appear to have been raised in the prior proceedings.  *Id.* at 12–

13.  In response to Venus's argument that its processing substantially transforms the

SS rounds, Commerce explained that "substantial transformation is not the proper

analysis when both products at issue fall within the same class or kind of merchandise."

*Id.* at 13.  Under those circumstances, Commerce stated, *NWR* is the "relevant

precedent" guiding its analysis.  *Id.*; *see also id.* at 13–14 (dismissing scope rulings

cited by Venus in which the agency concluded that cold-finishing substantially

transformed SS wire rod into SS bar because the input and output products belonged to

different classes or kinds of products).  Commerce also rejected Venus's argument that

its manufacturing process changed proportionally more of the essential physical

characteristics as compared to *NWR*, explaining that "there is no threshold for the

number of characteristics, whether expressed as an absolute or relative number, that

may be determinative for our analysis."  *Id.* at 13.  Looking to "the totality of the

circumstances," Commerce reiterated that the absence of new materials coupled with

the changes to three out of six characteristics led it to conclude that Venus is not the

producer.  *Id.*

## II.  Parties' Contentions

Venus raises three arguments against Commerce's determination.  Venus first

contends that Commerce unlawfully departed from agency practice without adequate

justification.  Pls.' Mem. at 8–9.  Venus next contends that prior scope determinations

finding that a "substantial transformation" occurred when SS wire rod was converted

into SS bar through a process similar to the process used by Venus in this case are

relevant and were improperly dismissed by the agency.  *Id.* at 10–13.  Lastly, Venus

contends that Commerce's *NWR* analysis ignored crucial facts.  *Id.* at 13–15; *see also*

Confidential Venus Wire Indus. Pvt. Ltd. and its Affiliates Precision Metals, Sieves Mfrs.

(India) Pvt. Ltd., and Hindustan Inox Ltd.'s Reply Br. in Supp. of their Rule 56.2 Mot. For

J. on the Agency R. ("Pls.' Reply") at 1–6, ECF No. 44.

The Government and Defendant-Intervenors contend that Venus has not shown the existence of an agency practice respecting its producer determination and Commerce permissibly concluded that Venus was not the producer of subject merchandise based on the record developed in this review.  Def.'s Resp. at 13–14; Def.-Ints.' Resp. at 9–10.  The Government and Defendant-Intervenors further contend that agency determinations applying Commerce's substantial transformation analysis are inapposite because those determinations involved inputs and outputs that occupied different classes or kinds of merchandise and sought to identify the country of origin of the imported merchandise, which is not at issue here.  Def.'s Resp. at 17–19; Def.-Ints.' Resp. at 10–13.  The Government and Defendant-Intervenors also contend that Commerce's findings pursuant to its *NWR* test are supported by substantial evidence. Def.'s Resp. at 16–17; Def.-Ints.' Resp. at 14–16.

### III. Commerce Must Reconsider or Further Explain its Use of the *NWR* Test to Determine the Producer of the Subject Merchandise

While Venus has not shown that Commerce's determination is inconsistent with an established agency practice, Commerce's summary dismissal of the relevance of the substantial transformation test in favor of the *NWR* test requires reconsideration and further explanation.  Thus, the court does not address Venus's direct challenges to the application of the *NWR* test.

### A.  Venus has not Established the Existence of an Agency Practice

While Venus casts its argument in terms of a departure from agency practice, Pls.' Mem. at 8–9; Pls.' Reply at 6–8, Venus has not shown that Commerce previously applied a practice or methodology to the question whether Venus is the producer of

subject merchandise.  Instead, Venus asserts that Commerce's treatment of Venus as

the producer in prior reviews constitutes the practice.  *See, e.g.*, Pls.' Mem. at 8.

However, Venus does not dispute Commerce's statement that the issue was never

examined in prior administrative reviews and, therefore, it is not possible to determine

whether prior facts were identical to this review and whether Commerce altered the

analytical framework applied to those facts.  *See* I&D Mem. at 13; Pls.' Mem. at 8–9;

Pls.' Reply at 6–8.  Absent evidence demonstrating the existence of an established

procedure or methodology relevant to this inquiry, Venus's argument that Commerce

arbitrarily departed from agency practice must fail.  *See SeAH Steel VINA Corp. v.*

*United States*, 40 CIT ___, ___,182 F. Supp. 3d 1316, 1327 (2016) (explaining that

departure from a consistent "contrary *practice* in similar circumstances" is arbitrary

when unaccompanied by a "reasonable explanation for the *change in practice*")

(quoting *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003)

(emphasis added); *Ranchers–Cattlemen Action Legal Found. v. United States*, 23 CIT

861, 884–85, 74 F. Supp. 2d 1353, 1374 (1999) (explaining that identification of an

"agency practice" is predicated upon the existence of "a *uniform and established*

*procedure* [] that would lead a party, in the absence of notification of a change,

reasonably to expect adherence *to the established practice or procedure*") (emphasis

added); *cf. Shikoku Chems. Corp. v. United States*, 16 CIT 382, 388, 795 F. Supp. 417,

422 (1992) (a methodology used in five previous segments of the proceeding effectively

became "the law of [the] proceeding[]" from which Commerce had departed without

adequate explanation).

In any event, in this review and in contrast to prior reviews, Commerce queried Venus's status as producer; developed the factual record accordingly; and rendered a decision based on the evidence presented.  *See* I&D Mem. at 10; 12–13.  Thus, the mere fact that Commerce reached a different conclusion in this review, standing alone, does not require remand to the agency.  Venus's remaining arguments on this issue are not persuasive.[9]

### B.  Commerce Must Reconsider or Further Explain its Use of the *NWR* Test

At issue here is Commerce's method of determining the producer of the subject merchandise when in-scope inputs are used to manufacture subject merchandise for purposes of 19 U.S.C §§ 1677b and 1677(28).  The statute does not define "producer" or provide a method for Commerce to apply in making its determinations.  Thus, the court must decide whether Commerce's use of the *NWR* test to determine that Venus was not the "producer" is in accordance with law.  *See, e.g.*, *Pesquera Mares*

---

[9] Venus argues that the facts at issue have not changed across each review.  Pls.' Reply at 8.  The pertinent point, however, is whether the factual *record* has changed. *See Jiaxing Brother Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2016) ("[E]ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different *facts in the record*.") (alteration in original) (emphasis added) (citation omitted).  Venus also argues that Commerce "is 'presumed to have considered' all record evidence in reaching its decision" in the prior reviews.  Pls.' Mem. at 9 n.4 (quoting *Ta Chen Stainless Steel Pipe Co. v. United States*, 31 CIT 794, 819 (2007)).  However, it is unclear to what extent the prior records contained evidence relevant to the producer issue because, as noted, the issue was never raised, and those records are not now before the court.  *See* I&D Mem. at 13. Lastly, Venus avers that Commerce has conducted verification of its facilities in past reviews "during which time [Commerce] officials almost certainly observed raw material being used in production." Pls.' Mem. at 8 n.2 (citations omitted).  However, such speculation is insufficient to undermine the factual record before the agency in the present review.

*Australes,* 266 F.3d at 1379–82; *cf. E.I. Du Pont de Nemours & Co. v. United States*, 22 CIT 370, 373–76, 8 F. Supp. 2d 854, 858–59 (1998) (examining the lawfulness of Commerce's substantial transformation test pursuant to *Chevron* prong two).  To determine whether the standard adopted by Commerce is a permissible interpretation of the statute, the court considers whether the construction is reasonable, consistent with statutory goals, and reflects agency practice.  *Apex Exps. v. United States*, 777 F.3d 1373, 1379 (Fed. Cir. 2015).

Here, Commerce provided little explanation to support its use of the *NWR* test over its substantial transformation test beyond stating that the *NWR* test is the "relevant precedent" when the input and output products are in the same class or kind of merchandise.[10]  I&D Mem. at 13.  However, merely pointing to what the agency "has

---

[10] Commerce relies heavily on the fact that while SS wire rod and SS bar are considered separate classes or kinds of merchandise, I&D Mem. at 13–14, SS rounds are considered to be within the same class or kind of merchandise as SS bar, *id.* at 12–13.  There is, however, no inherent, objective basis for these differences.  The class or kind of merchandise involved in any proceeding is typically a function of, and coterminous with, the scope of merchandise for which the petitioner seeks relief—and the breadth of that scope may change from case to case.  *See, e.g.*, *Hitachi Metals, Ltd. v. United States*, 42 CIT ___, ___, 350 F. Supp. 3d 1325, 1343–49 (2018) (reviewing a U.S. International Trade Commission determination in a cut-to-length plate ("CTL") investigation in which the scope (and Commerce's determination as to class or kind) included certain alloy CTL which had not been included in prior CTL investigations).  While production processes are taken into consideration, Commerce also considers non-production criteria such as administrability and circumvention concerns.  *See* Issues and Decision Mem. for the Final Determination in the Antidumping Duty Investigation of Multilayered Wood Flooring from the People's Republic of China, A-570-970 (Oct. 18, 2011) at 54, *available at* https://enforcement.trade.gov/frn/summary/ PRC/2011-26932-1.pdf (last visited Dec. 20, 2019); Issues and Decision Mem. for the Final Determination of the Less-Than-Fair-Value Investigation of Certain Steel Wheels from the People's Republic of China, A-570-082 (Mar. 21, 2019) at 9–13, *available at* https://enforcement.trade.gov/frn/summary/prc/2019-05957-1.pdf (last visited Dec. 20,

done [once] before . . . is not, by itself, an explanation of why its methodology comports

with the statute." *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 537–

38 (Fed. Cir. 2019) (ellipsis in original) (internal quotation marks and citation omitted).

    Moreover, Commerce, in fact, has used its substantial transformation test when

the input and output products were in the same class or kind of merchandise. *See, e.g.*,

Tapered Roller Bearings from the People's Republic of China: Issues and Decision

Mem. for the Final Results of the 2007–2008 Admin. Review of the Antidumping Duty

Order, A-570-601 (Dec. 28, 2009) ("TRBs from China Mem.") at 7, *available at*

https://enforcement.trade.gov/frn/summary/prc/E9-31417-1.pdf (last visited Dec. 20,

2019) (substantial transformation did not occur when unfinished tapered roller bearings

were processed into finished tapered roller bearings and the processing did not alter the

class or kind of merchandise); Issues and Decision Mem. for the Final Determination in

the Antidumping Duty Investigation of [D]iamond [S]awblades and Parts Thereof from

the People's Republic of China, A-570-900 (May 22, 2006) ("DSBs from China Mem.")

at 17–19, *available at* https://enforcement.trade.gov/frn/summary/prc/E6-7763-1.pdf

(last visited Dec. 20, 2019) (substantial transformation occurred when diamond cores

were attached to diamond segments to produce finished diamond sawblades

notwithstanding that the upstream and downstream products were within the same

class or kind of merchandise); *3.5" Microdisks and Coated Media Thereof From Japan*,

54 Fed. Reg. 6,433, 6,434–35 (Dep't Commerce Feb. 10, 1989) (final determination of

---

2019).  Thus, Commerce must establish the reasonableness of relying on its class or
kind distinction if that distinction continues to play a central role in the agency's analysis.

sales at less than fair value) (processing performed in Canada on microdisks from Japan did not alter the class or kind of merchandise but was sufficiently significant to render Canada as the country of origin for antidumping purposes); *Erasable Programmable Read Only Memories (EPROMs) From Japan*, 51 Fed. Reg. 39,680, 39,692 (Dep't Commerce Oct. 30, 1986) (final determination of sales at less than fair value) (substantial transformation did not occur when processed wafers and dice from Japan were assembled into finished EPROMs in Singapore and remained in the same class or kind of merchandise).

As the foregoing agency determinations demonstrate, class or kind of merchandise is but one factor Commerce considers in conducting its substantial transformation test—and it "is not [even] a controlling factor." DSBs from China Mem. at 18;[11] *see also, e.g.*, TRBs from China Mem. at 7 ("[W]hile we consider the class or kind of [merchandise] to be an important factor in determining substantial transformation, it is not the only factor we considered. . . ."); *supra* note 10. Thus, Commerce's attempt to portray changes to the class or kind of merchandise as determinative of whether the substantial transformation test applies runs counter to decades of agency precedent.

---

[11] While the formulation of the factors Commerce considers in a substantial transformation test varies slightly across proceedings, in general, Commerce considers "(1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment." *Bell Supply Co. v. United States*, 888 F.3d 1222, 1228–29 (Fed. Cir. 2018); *cf.* Laminated Woven Sacks from the People's Republic of China: Issues and Decision Mem. for the Final Results of the First Antidumping Duty Admin. Review, A-570-916 (Mar. 14, 2011) at 4–5, *available at* https://enforcement.trade.gov/frn/summary/prc/2011-6450-1.pdf (last visited Dec. 20, 2019).

Further, while Commerce has used the substantial transformation test to determine country of origin, *see, e.g.*, *Bell Supply*, 888 F.3d at 1228–31, Commerce has not limited the substantial transformation test to country of origin determinations, *see* I&D Mem. at 13.[12]  That test, which examines whether certain "manufacturing or processing steps" result in a "new product having a new name, character and use," *Bell Supply*, 888 F.3d at 1228 (quoting *Bestfoods v. United States*, 165 F.3d 1371, 1373 (Fed. Cir. 1999)), appears at least facially relevant to Commerce's identification of the producer of the subject merchandise.  Regardless of whether the "manufacturing or processing steps" occur in country B or are performed by company B, Commerce's inquiry is directed at the circumstances under which an input becomes an output and whether that output should be attributed to country B or company B.  Commerce's disregard of the substantial transformation test without substantive explanation is not entitled to deference.

As previously noted, Commerce concluded that Venus is the producer of SS bar manufactured from SS wire rod.  Final Analysis Mem. at 4.  That finding is consistent with several scope determinations upon which Venus relies and in which Commerce concluded that that the conversion of SS wire rod into SS bar constitutes a substantial transformation.  *See* Pls.' Mem. at 12–13 & n.16 (citations omitted); Pls.' Reply at 2–5;

---

[12] Thus, the Government's argument that the substantial transformation test is inapplicable here because country of origin is not at issue is entirely *post hoc* and, thus, not a basis to sustain Commerce's determination.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

Scope Rulings, Suppl. CJA at ECF pp. 7–89.[13]  However, to the extent that Commerce

relied on a substantial transformation analysis because SS wire rod and SS bar are in

different classes or kinds of merchandise, that reliance undermines the Government's

*post hoc* argument that the substantial transformation test is inapplicable when country

of origin is not at issue.  Further, because agency precedent demonstrates that the

substantial transformation test may apply irrespective of changes in the class or kind of

merchandise, *see supra* pp. 17–18, Commerce's use of the substantial transformation

test in connection with one input (SS wire rod) but not the other (SS rounds) is, without

further explanation, arbitrary.

  Additionally, Commerce's dismissal of the relevance of the scope rulings and the

substantial transformation test led it to further ignore Venus's central argument that the

---

[13] The scope determinations submitted in the supplemental confidential joint appendix include, among others, (1) Final Recommendation Mem.—Scope Ruling Req. by Ishar Bright Steel Ltd. on Whether Stainless Steel Bar is Subject to the Scope of the Antidumping and Countervailing Duty Orders on Stainless Steel Wire Rod from Subject Countries (Feb. 7, 2005) ("UAE SSWR Scope Ruling"); (2) Scope Req. from Rodacciai S.p.A.—Final Scope Ruling Concerning the Stainless Steel Wire Rod from Spain Order [and] Initiation and Prelim. Scope Ruling Concerning the Stainless Steel Bar from Spain Order (May 12, 2015) ("Spain Final SSWR Scope Ruling"); and (3) Scope Req. from Rodacciai S.p.A.—Final Scope Ruling Concerning the Stainless Steel Bar from Spain Order (July 10, 2015) ("Spain Final SSB Scope Ruling").  Each of those rulings address the conversion of SS wire rod into SS bar for purposes of determining country of origin and the applicability of orders covering SS wire rod or SS bar.  *See* UAE SSWR Scope Ruling at 1; Spain Final SSWR Scope Ruling at 1; Spain Final SSB Scope Ruling at 1. In the first ruling, Commerce—after extensive analysis—determined that SS bar and SS wire rod occupy different classes or kinds of merchandise and the SS bar produced in the United Arab Emirates using SS wire rod imported from countries subject to antidumping or countervailing duty orders on SS wire rod was not covered by those orders.  UAE SSWR Scope Ruling at 5–12.  Commerce relied on these findings in subsequent determinations.  Spain Final SSWR Scope Ruling at 19–25, 29; Spain Final SSB Scope Ruling at 19–24, 26–27, 29.

processing of SS wire rod into SS bar affects the physical characteristics of SS wire rod

in the same way that the "nearly identical" processing of SS rounds into SS bar affects

the physical characteristics of the SS rounds.  I&D Mem. at 4–5 (summarizing Venus's

arguments); *see also* Pls.' Mem. at 12–13; Pls.' Reply at 2–3.  Because changes in the

class or kind of merchandise (or lack thereof) are not necessarily determinative of

substantial transformation, it is not clear that conversion of SS rounds into SS bar would

*not* constitute a substantial transformation.  It is also not clear that application of the

*NWR* test to the SS bar manufactured from SS wire rod would not produce the same

results as occurred when that test was applied to SS bar manufactured from SS rounds.

The record suggests that there is a comparable absence of additional materials and

changes in product characteristics regardless of the starting input.  *See* Pls.' Reply at 5.

Commerce, however, ignored these parallels and, instead, appeared to rely solely on

the class or kind demarcations.  *See* Final Analysis Mem. at 4.

For these reasons, Commerce's wholesale disregard of its established

substantial transformation test requires further consideration and explanation by the

agency.  The court does not hold that Commerce *must* use its substantial

transformation test or *must not* use the *NWR* test.  Rather, the court holds that

Commerce has not adequately addressed why the substantial transformation test is

irrelevant under the circumstances presented by this case.  Accordingly, this matter is

remanded to the agency for further consideration and explanation.  The court will defer

Court No. 18-00113                                                         Page 22

reaching Venus's other arguments regarding Commerce's application of the *NWR* test

and Commerce's use of total AFA pending Commerce's redetermination on remand.[14]

CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby:

**ORDERED** that Commerce's *Final Results* are remanded to the agency for

further consideration and explanation consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand results on or before March 19.

2020; and it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule

56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000

words.


                                                    /s/      Mark A. Barnett
                                                    Mark A. Barnett, Judge


Dated: December 20, 2019
        New York, New York

---

[14] Commerce based its decision to use an adverse inference on two subsidiary findings
that Venus did not act to the best of its ability: (1) "by failing to clearly identify" its
purchases of subject inputs "until directly asked in the third supplemental
questionnaire," and (2) "in attempting to obtain its unaffiliated suppliers' cost data."  I&D
Mem. at 16.  While the first finding is arguably relevant notwithstanding the court's
remand of Commerce's determination that Venus is not the producer, Commerce's
explanation suggests—though is not entirely clear—that both findings are necessary to
support the use of AFA.  *See id.* at 16–17.  Because the second finding would be
obviated in the event Commerce reconsiders its decision that Venus is not the producer,
the court will await further clarity from Commerce on remand as to its basis for using an
adverse inference—if it continues to do so—before addressing this issue.