Slip Op. 20-118

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| VENUS WIRE INDUSTRIES PVT. LTD., ET AL., | |
| Plaintiffs, | |
| v. | Before: Mark A. Barnett, Judge |
| UNITED STATES, | Court No. 18-00113 |
| Defendant, | **PUBLIC VERSION** |
| and | |
| CARPENTER TECHNOLOGY CORPORATION, ET AL., | |
| Defendant-Intervenors. | |

## <u>OPINION AND ORDER</u>

[Remanding the U.S. Department of Commerce's final results in the changed circumstances review of the antidumping duty order on stainless steel bar from India, as amended by the results of redetermination pursuant to court remand.]

Dated: August 14, 2020

<u>Eric C. Emerson</u> and <u>St. Lutheran M. Tillman</u>, Steptoe & Johnson LLP, of Washington, DC, for Plaintiffs.

<u>Kara M. Westercamp</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With her on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Tara Hogan</u>, Assistant Director. Of counsel on the brief was <u>Emma T. Hunter</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Grace W. Kim</u> and <u>Laurence J. Lasoff</u>, Kelley Drye & Warren LLP, of Washington, DC, for Defendant-Intervenors.

Barnett, Judge: This matter is before the court following the U.S. Department of

Commerce's ("Commerce" or "the agency") redetermination upon court-ordered

remand.  *See* Results of Redetermination Pursuant to Court Remand ("Remand

Results"), ECF No. 61-1.  Plaintiffs, Venus Wire Industries Pvt. Ltd. and its affiliates

Precision Metals, Sieves Manufacturers (India) Pvt. Ltd., and Hindustan Inox Ltd.

(collectively, "Venus"), commenced this action challenging Commerce's final results in

the changed circumstances review of the antidumping duty order on stainless steel bar

from India.  *See* Compl., ECF No. 9; *Stainless Steel Bar From India*, 83 Fed. Reg.

17,529 (Dep't Commerce Apr. 20, 2018) (final results of changed circumstances review

and reinstatement of certain companies in the antidumping duty order) ("*Final Results*"),

ECF No. 20-5, and accompanying Issues and Decision Mem., A-533-810 (Apr. 16,

2018) ("I&D Mem."), ECF No. 20-6.[1]  Venus, an exporter of subject merchandise,

contested Commerce's determinations (1) that Venus is not the producer of subject

merchandise made from inputs that are covered by the scope of the underlying

antidumping duty order; and (2) to use total facts otherwise available with an adverse

inference (referred to as "total adverse facts available" or "total AFA") to determine

---

[1] The administrative record associated with the *Final Results* is divided into a Public
Administrative Record ("PR"), ECF No. 20-2, and a Confidential Administrative Record
("CR"), ECF Nos. 20-3, 20-4.  The administrative record for the Remand Results is
likewise divided.  *See* Public Remand R., ECF No. 62-2; Confidential Remand R., ECF
No, 62-3.  Parties submitted joint appendices containing record documents cited in their
Rule 56.2 briefs.  *See* Public J.A. ("PJA"), ECF No. 50; Confidential J.A. ("CJA"), ECF
No. 46; Confidential Joint Submission of R. Documents ("Suppl. CJA"), ECF No. 53.
Because parties did not cite to additional record documents in their respective
comments on the Remand Results, there is no joint appendix on file with respect to the
Remand Results.  The court references the confidential version of the relevant record
documents, unless otherwise specified.

Venus's rate.  [Venus's] Mem. of P&A in Supp. of their Mot. For J. on the Agency R. ("Pls.' Mem."), ECF No. 33.  In a previous opinion, the court remanded Commerce's determination that Venus is not the producer of subject merchandise manufactured from in-scope inputs and deferred Venus's challenge to Commerce's use of total AFA; familiarity with that opinion is presumed.  *See generally Venus Wire Indus. Pvt. Ltd. v. United States* ("*Venus I*"), 43 CIT ___, 424 F. Supp. 3d 1369 (2019).

Commerce has now issued a remand determination in which it provides additional explanation in support of its conclusion that Venus is not the producer of certain subject merchandise and made no changes to the *Final Results*.  Remand Results at 3–11, 14–20.  Venus opposes Commerce's Remand Results.  *See* Pls.' Comments on the Remand Redetermination ("Pls.' Opp'n Cmts."), ECF No. 64.  Defendant United States ("the Government") and Defendant-Intervenors[2] support Commerce's Remand Results.  *See* Def.'s Resp. to Pls.' Comments on the Remand Redetermination ("Def.'s Reply Cmts."), ECF No. 65; Def.-Ints.' Reply to Pls.' Comments on the Remand Redetermination ("Def.-Ints.' Reply Cmts."), ECF No. 66.

For the reasons discussed herein, the court remands Commerce's *Final Results*, as amended by the Remand Results, for reconsideration of the agency's determination to use total AFA consistent with this Opinion.

---

[2] Defendant-Intervenors consist of Carpenter Technology Corporation; Crucible Industries LLC; Electralloy, a Division of G.O. Carlson, Inc.; North American Stainless; Outokumpu Stainless Bar, LLC; Universal Stainless & Alloy Products, Inc.; and Valbruna Slater Stainless, Inc. (collectively, "Defendant-Intervenors" or, when in reference to the underlying administrative proceeding, "Petitioners").

**BACKGROUND**

## I.  Prior Proceedings[3]

Commerce published the antidumping duty order on stainless steel ("SS") bar

("SSB" or "SS bar") from India on February 21, 1995.  *See Stainless Steel Bar from*

*Brazil, India and Japan*, 60 Fed. Reg. 9,661 (Dep't Commerce Feb. 21, 1995)

(antidumping duty orders) ("*SS Bar Order*").[4]  On September 13, 2011, Commerce

conditionally revoked the *SS Bar Order* with respect to subject merchandise produced

or exported by Venus.  *See Stainless Steel Bar from India*, 76 Fed. Reg. 56,401,

56,402–03 (Dep't Commerce Sept. 13, 2011) (final results of the antidumping duty

admin. review, and revocation of the order, in part) ("*Revocation Finding*").[5]  Commerce

---

[3] While familiarity with *Venus I* is presumed, the court summarizes the background relevant to the court's disposition of the issues considered herein.

[4] The merchandise covered by the scope of the *SS Bar Order* consists of articles of stainless steel in straight lengths that have been either hot-rolled, forged, turned, cold-drawn, cold-rolled or otherwise cold-finished, or ground, having a uniform solid cross section along their whole length in the shape of circles, segments of circles, ovals, rectangles (including squares), triangles, hexagons, octagons or other convex polygons.  SSB includes cold-finished SSBs that are turned or ground in straight lengths, whether produced from hot-rolled bar or from straightened and cut rod or wire, and reinforcing bars that have indentations, ribs, grooves, or other deformations produced during the rolling process.

*SS Bar Order*, 60 Fed. Reg. at 9,661.

[5] Commerce's authority to revoke an order is grounded in 19 U.S.C. § 1675.  By its terms, Commerce "may revoke, in whole or in part, . . . an antidumping duty order" upon completion of a periodic or changed circumstances review.  19 U.S.C. § 1675(d)(1). Pursuant to the regulation in effect at the time of revocation, Commerce could revoke an order in part when it finds that (A) an exporter or producer has "sold the merchandise at not less than normal value for a period of at least three consecutive years"; (B) the exporter or producer has agreed in writing to immediate reinstatement of the order if Commerce determines that, subsequent to revocation, the exporter or producer sells subject merchandise at less than fair value; and (C) continued application of the order is

subsequently initiated this "changed circumstances" review of Venus on December 16,

2016, in response to Petitioners' allegations that the company "had resumed selling SS

bar in the United States at less than fair value."  *Venus I*, 424 F. Supp. 3d at 1372.

    In the instant changed circumstances review, Commerce "requested Venus to

describe the materials used in the production of subject merchandise."  *Id*.  Venus

reported using SS wire rod or SS black bar to produce the subject merchandise.  *Id.*

Elsewhere in its questionnaire responses, Venus referred to its input of SS black bar

variously as hot rolled SS rounds, SS rounds, straight rounds, or hot rolled bar.  *Id.*  In

response to Commerce's third supplemental questionnaire, Venus acknowledged that

the input referred to as "SS rounds" is covered by the scope of the *SS Bar Order*.  *Id.*

    Following issuance of the preliminary determination in which Commerce

proposed to reinstate Venus in the *SS Bar Order* and found that Venus's unaffiliated

suppliers of SS rounds were the producers of SS bar made using SS rounds,

Commerce requested Venus to obtain cost information from those suppliers.  *See id*. at

1373; Decision Mem. for the Prelim. Results of the Antidumping Duty Changed

Circumstances Review of Stainless Steel Bar from India (Oct. 12, 2017) ("Prelim.

Mem.") at 1, 5, PR 377, CJA Tab 19.  In response, Venus reported its "significant efforts

to obtain the cost of the stainless steel rounds purchased from unaffiliated suppliers

during the [period of review]."  Req. for Extension to 4th Suppl. Resp. (Nov. 14, 2017)

("Venus 4th Suppl. DQR") at 1, CR 318–19, PR 398, CJA Tab 24.  Venus personnel

---

unnecessary to offset dumping.  19 C.F.R. § 351.222(b)(2)(i) (2011).  Commerce
determined that Venus met each of these requirements.  *Revocation Finding*, 76 Fed.
Reg. at 56,403.

visited several suppliers and sent its suppliers emails "cautioning them of cessation of future business" if they refused to provide their cost information.  *Id.* at 3; *see also id.* at Ex. 1 (documenting Venus's efforts).[6]  "Despite these efforts, only one of Venus's suppliers submitted its cost information to Commerce."  *Venus I*, 424 F. Supp. 3d at 1373; *see also* Venus 4th Suppl. DQR at 1–2.

For the *Final Results*, Commerce concluded that Venus was not the producer of subject merchandise manufactured from SS rounds;[7] reinstated Venus in the *SS Bar Order*; and assigned Venus a weighted-average dumping margin of 30.92 percent based on the use of total AFA.  83 Fed. Reg. at 17,530; I&D Mem. at 11–17; Final Analysis Mem. at 1–3.

In making its determination, Commerce applied a test for identifying the producer of the subject merchandise that it first used in its investigation of narrow woven ribbon with woven selvedge from Taiwan.  I&D Mem. at 11 & n.35 (citing *Narrow Woven Ribbons with Woven Selvedge from Taiwan*, 75 Fed. Reg. 41,804 (Dep't Commerce July 19, 2010) (notice of final determination of sales at less than fair value) ("*NWR*"), and accompanying Issues and Decision Mem., A-583-844 (undated) ("NWR Decision Mem.") at 48–49, available at https://enforcement.trade.gov/frn/summary/taiwan/2010-

---

[6] Specifically, Venus informed its suppliers that refusal to cooperate would result in Venus "[[

                                                                                                      ]]."  Venus 4th Suppl. DQR, Ex. 1 at ECF p. 532; *see also id.*, Ex. 1 at ECF p. 571 (further cautioning "the cessation of future business").  Venus also offered to cover the cost of preparing and filing the cost information.  *Id.*, Ex. 1 at ECF pp. 534, 552.

[7] Commerce found that Venus was the producer of subject merchandise manufactured from SS wire rod.  Final Results Analysis Mem. for [Venus]. (Apr. 16, 2018) ("Final Analysis Mem.") at 4, CR 327, PR 424, CJA Tab 32.

17538-1.pdf (last visited August 14, 2020)).  Pursuant to *NWR*, Commerce considers

"whether raw materials were added, and whether further processing was performed that

changed the physical nature and characteristics of the product."  NWR Decision Mem.

at 48.  Here, Commerce concluded that "because Venus's processing 'does not affect

three of the six essential physical characteristics' of the subject merchandise . . . and

does not require the addition of new materials," Venus was not "the producer of the

subject merchandise."  *Venus I*, 424 F. Supp. 3d at 1375 (quoting I&D Mem. at 12–13).[8]

Commerce rejected Venus's argument that the agency should instead apply its

substantial transformation test,[9] explaining that "substantial transformation is not the

proper analysis [when] both products at issue [i.e., input and output] fall within the same

class or kind of merchandise."  I&D Mem. at 13.

Regarding Commerce's use of total AFA, the agency explained that "necessary

information" in the form of cost data from all except one of Venus's unaffiliated suppliers

was missing from the record.  *Id.* at 16.  Commerce further determined that "[Venus]

and its unaffiliated suppliers [] withheld information that [the agency] requested . . . ,

failed to provide the information [] requested by the deadlines for submission of the

information or in the form and manner [] requested . . . , and have significantly impeded

---

[8] The six essential physical characteristics of SS bar are: grade, remelting, shape, type of finish, type of final finishing operation, and size.  I&D Mem. at 12.  Of those, Venus's processing may affect finish, type of final finishing operation, and size.  *Id.*

[9] The factors Commerce considers in its substantial transformation analysis generally consist of "(1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment."  *Venus I*, 424 F. Supp. 3d at 1378 n.11 (quoting *Bell Supply Co. v. United States*, 888 F.3d 1222, 1228–29 (Fed. Cir. 2018)).

this proceeding." *Id.*  Commerce also found that Venus "significantly impeded this proceeding" by failing "to clearly identify that it purchases SS Bar as an input until directly asked in the third supplemental questionnaire." *Id.*  For those reasons, Commerce determined that it was necessary to select from among the facts otherwise available. *Id.*  Commerce further determined that an adverse inference was appropriate when selecting from among the facts available. *Id.* at 16–17.

Commerce reasoned that Venus "failed to act to the best of its ability by failing to clearly identify that it purchase[d] SS Bar as an input until directly asked in the third supplemental questionnaire. *Id.* at 16.  Commerce further found that Venus "did not act to the best of its ability in attempting to obtain its unaffiliated suppliers' cost data," *id.*, because "it could have done more to induce its suppliers to cooperate," Final Analysis Mem. at 3.  Commerce explained that Venus "is an experienced company [that] is seeking to maintain its exclusion from the order" and, thus, "it is reasonable to expect that, before doing business with these suppliers, [Venus] would ensure that it would have their full cooperation in any antidumping proceeding with Commerce." *Id.*  Commerce faulted Venus for its delay in specifying potential consequences for noncooperation to its suppliers and for the language Venus used to warn its suppliers about the possibility of those consequences. *Id.*[10]  Commerce opined that its findings

---

[10] Specifically, Commerce faulted Venus for indicating that any [[

                                        ]].  Final Analysis Mem. at 3.  Because Venus's warnings only "[[

              ]]," Commerce found that the warnings "did not serve as a strong inducement to cooperate." *Id.*

were consistent with the U.S. Court of Appeals for the Federal Circuit's ("Federal

Circuit") opinion in *Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States*,

753 F.3d 1227, 1233 (Fed. Cir. 2014). I&D Mem. at 16 & n.65 (citation omitted); Final

Analysis Mem. at 3 & n.17 (citation omitted). Commerce selected the rate of 30.92

percent, calculated in a prior administrative review of the *SS Bar Order,* to use as

Venus's margin. I&D Mem. at 17 & n.66 (citation omitted).[11]

Following oral argument,[12] the court concluded that Commerce had failed to

adequately explain why its "substantial transformation test is irrelevant under the

circumstances presented by this case." *Venus I*, 424 F. Supp. 3d at 1380. The court

noted that Commerce has used its substantial transformation test—and, indeed, found

that a substantial transformation has occurred—when there was no change in the class

or kind of merchandise with respect to the input and output products. *Id.* at 1378 (citing,

*inter alia*, Issues and Decision Mem. for the Final Determination in the Antidumping

Duty Investigation of [D]iamond [S]awblades and Parts Thereof from the People's

Republic of China, A-570-900 (May 22, 2006) ("*DSBs From China*") at 17–19, *available*

*at* https://enforcement.trade.gov/frn/summary/prc/E6-7763-1.pdf (last visited August 14,

---

[11] Commerce explained that subject merchandise that Venus processed using SS bar
purchased from unaffiliated suppliers accounted for [[     ]] percent of its U.S. sales.
Final Analysis Mem. at 3. In contrast, the remaining [[     ]] percent of U.S. sales
consisted of SS bar Venus produced from SS wire rod. *Id.* at 3–4. Commerce rejected
Venus's suggestion that the agency should calculate a margin for the [[          ]] of
sales for which Venus was the producer and average that margin with the AFA rate
used for sales in which Venus was not the producer. *Id.* Commerce considered it
"unreasonable to attempt a 'plug' constituting such a [[                              ]]
of [Venus's] U.S. sales." *Id.* at 4.
[12] The court held oral argument on September 10, 2019. Docket Entry, ECF No. 56.

2020) (substantial transformation occurred when diamond cores were attached to diamond segments to produce finished diamond sawblades notwithstanding that the upstream and downstream products were within the same class or kind of merchandise); *3.5″ Microdisks and Coated Media Thereof From Japan*, 54 Fed. Reg. 6,433, 6,434–35 (Dep't Commerce Feb. 10, 1989) (final determination of sales at less than fair value) ("*Microdisks From Japan*") (processing performed in Canada on coated media from Japan did not alter the class or kind of merchandise but was sufficiently significant to render Canada as the country of origin for antidumping purposes)).  The court explained that the substantial transformation test "appears at least facially relevant to Commerce's identification of the producer of the subject merchandise" because "[r]egardless of whether the manufacturing or processing steps occur in country B or are performed by company B, Commerce's inquiry is directed at the circumstances under which an input becomes an output and whether that output should be attributed to country B or company B."  *Id.* at 1379.

The court further faulted Commerce for summarily dismissing the relevance of several scope rulings in which the agency determined that the processing of SS wire rod into SS bar constituted a substantial transformation, given the "parallels" between that process and the processing of SS rounds into SS bar.  *Id.* at 1380; *see also* Scope Rulings, Suppl. CJA at ECF pp. 7–89.[13]  The court declined to address Venus's

_____

[13] The scope determinations submitted in the supplemental confidential joint appendix include, among others, (1) Final Recommendation Mem.—Scope Ruling Req. by Ishar Bright Steel Ltd. on Whether Stainless Steel Bar is Subject to the Scope of the Antidumping and Countervailing Duty Orders on Stainless Steel Wire Rod from Subject

challenge to the application of the *NWR* test and Commerce's use of total AFA to

determine Venus's rate pending Commerce's redetermination.  *Venus I*, 424 F. Supp.

3d at 1371, 1376.

### II.  Commerce's Determination on Remand

On remand, Commerce clarified the tests it applies in different situations.

Commerce explained that it uses its substantial transformation test only when country of

origin is at issue (including anti-circumvention proceedings pursuant to 19 U.S.C.

§ 1677j in which country of origin is also at issue).  Remand Results at 3–7, 14–15.  In

contrast, Commerce uses its *NWR* test in order to determine "the producer of subject

merchandise that is *made in the subject country* from an input product that is the *same

class or kind* of product as the imported article."  *Id.* at 3 (emphasis added); *see also id.*

at 15 (explaining that the *NWR* test applies when the input and output products are the

same class or kind of merchandise and country of origin is not at issue).  When subject

merchandise is manufactured in the subject country from an input product that is *not* the

_____

Countries (Feb. 7, 2005) ("UAE SSWR Scope Ruling"); (2) Scope Req. from Rodacciai
S.p.A.—Final Scope Ruling Concerning the Stainless Steel Wire Rod from Spain Order
[and] Initiation and Prelim. Scope Ruling Concerning the Stainless Steel Bar from Spain
Order (May 12, 2015) ("Spain Final SSWR Scope Ruling"); and (3) Scope Req. from
Rodacciai S.p.A.—Final Scope Ruling Concerning the Stainless Steel Bar from Spain
Order (July 10, 2015) ("Spain Final SSB Scope Ruling").  Each of those rulings address
the conversion of SS wire rod into SS bar for purposes of determining country of origin
and the applicability of orders covering SS wire rod or SS bar.  *See* UAE SSWR Scope
Ruling at 1; Spain Final SSWR Scope Ruling at 1; Spain Final SSB Scope Ruling at 1.
For ease of reference, the court will refer to these rulings collectively as the
"SSWR/SSB Scope Rulings."

same class or kind as the output product, Commerce stated unequivocally that "the

producer is the entity that manufactured the output product."  *Id.* at 11.

Commerce further explained that the respective criteria encompassed by the

substantial transformation and *NWR* tests "are specific to the two different types of

questions that they address."  *Id.* at 3.  While a change in the class or kind of

merchandise is not necessarily dispositive in a substantial transformation analysis, the

agency explained, "it is an important factor and, in practice, has largely informed the

ultimate outcome except in unusual situations."  *Id.* at 7.  For that reason, Commerce

stated, the agency's determinations in the SSWR/SSB Scope Rulings were largely

informed by changes in the class or kind of merchandise.  *Id.* at 5–6, 17–18.[14]  Thus,

having explained "why the substantial transformation test is irrelevant under the

circumstances presented by this case," Commerce "made no changes to the *Final*

*Results*."  *Id.* at 20.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[15] and 28 U.S.C. § 1581(c).

---

[14] Commerce explained that in "country of origin determinations in which both the input
and output products are within the same class or kind of merchandise," it almost always
finds that the country of origin of the output product is "the country in which the input
product was produced."  Remand Results at 7.  According to Commerce, the agency's
respective determinations in *DSBs From China* and *Microdisks From Japan* are two
exceptions to this trend.  *Id.* at 7 & n.25, 9–10.
[15] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S.
Code, and all references to the U.S. Code are to the 2018 edition, unless otherwise
stated.

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order."  *SolarWorld Ams., Inc. v. United States*, 41 CIT ___, ___, 273 F. Supp. 3d 1314, 1317 (2017).

The two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45 (1984), guides judicial review of Commerce's interpretation and implementation of the antidumping and countervailing duty statutes.  *See Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1344 (Fed. Cir. 2017); *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379–82 (Fed. Cir. 2001) (affording *Chevron* deference to agency methodology in furtherance of its statutory interpretations).  First, the court must determine "whether Congress has directly spoken to the precise question at issue." *Apex Frozen Foods*, 862 F.3d at 1344 (quoting *Chevron*, 467 U.S. at 842).  If Congress's intent is clear, "that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress."  *Id.* (quoting *Chevron*, 467 U.S. at 842–43).  However, "if the statute is silent or ambiguous," the court must determine whether the agency's action "is based on a permissible construction of the statute."  *Id.* (quoting *Chevron*, 467 U.S. at 843).

DISCUSSION

## I. Commerce's Determination that Venus is Not the Producer of Subject Merchandise Made from SS Bar

### A. Parties' Contentions

Venus contends that, in the Remand Results, Commerce again relied on the absence of a class or kind demarcation to reject the use of the substantial transformation test, Pls.' Opp'n Cmts. at 3, 6, 7, and failed to address the instances in which Commerce "used a substantial transformation test" when "the input and output products are within the same class or kind [of merchandise]," *id.* at 4. Venus further rejects Commerce's characterization of the basis for its decisions in the SSWR/SSB Scope Rulings. *Id.* at 8–10.[16]

The Government contends that Commerce complied with the court's order to explain why it utilized the *NWR* test instead of the substantial transformation test. Def.'s

---

[16] Venus argues that Commerce's assertion that it uses the substantial transformation test when country of origin is at issue constitutes "impermissible *post hoc* rationalization" because "Commerce did not identify where in its Final Results it had relied upon a country of origin distinction to reject the substantial transformation test." Pls.' Opp'n Cmts. at 3–4. According to Venus, the court previously "concluded that Commerce's reliance on the 'country of origin' explanation constituted an impermissible *post hoc* rationalization." *Id.* at 3 & n.9 (citing *Venus I*, 424 F. Supp. 3d at 1379 n.12). Venus misconstrues the court's opinion. For its *Final Results*, Commerce relied on the absence of class or kind distinctions to reject the substantial test, I&D Mem. at 13, whereas the Government (i.e., the U.S. Department of Justice, which represents Commerce in this case) took the position *in litigation* that the substantial transformation test did not apply when country of origin was not at issue, Confidential Def.'s Resp. to Pls.' Mots. For J. Upon the Agency R. ("Def.'s Resp.") at 17, ECF No. 39. Thus, the court characterized the Government's—not Commerce's—argument as *post hoc*. *Venus I*, 424 F. Supp. 3d at 1379 n.12 (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962)). In the Remand Results, Commerce explained that its substantial transformation test *is* limited to country of origin

Reply Cmts. at 6–8; *see also id.* at 9–11 (contending further that Commerce adequately

addressed agency rulings applying the substantial transformation test when there was

no change in the class or kind of merchandise because, in those rulings, country of

origin was at issue).  The Government also contends that Venus failed to support its

contention that Commerce's analysis in the SSWR/SSB Scope Rulings turned on the

degree of processing and not the change in class or kind of merchandise.  *Id.* at 8–9;

*see also* Def.-Ints.' Reply Cmts. at 2–8 (advancing similar arguments).

### B. Commerce Permissibly Used the *NWR* Test to Determine the Producer of the Subject Merchandise

Commerce's task on remand was to further "address[] why the substantial

transformation test is irrelevant under the circumstances presented by this case."

*Venus I*, 424 F. Supp. 3d at 1380.  Commerce responded by clarifying when certain

analytical tests are utilized.  *See* Remand Results at 3–11.  Commerce explained that

its "practice" is to use the substantial transformation test "only" when country of origin is

at issue.  *Id.* at 14.  Indeed, Commerce has used a substantial transformation analysis

in the context of country of origin determinations since at least 1949, *see Foreign Trade*

*Statistics: Country of Origin for Statistical Purposes*, 14 Fed. Reg. 6,446 (Dep't

Commerce Oct. 21, 1949) (proposed rules), and in antidumping proceedings specifically

since at least 1980, *see Calcium Pantothenate From Japan*, 45 Fed. Reg. 59,933,

---

determinations.  Remand Results at 3–7, 14–15.  Accordingly, Commerce's explanation
is not a *post hoc* rationalization.  *See, e.g.*, *Fengchi Imp. & Exp. Co., Ltd. of Haicheng
City v. United States*, 39 CIT ___, ___, 98 F. Supp. 3d 1309, 1315 (2015) ("The remand
proceeding is an administrative proceeding, meaning that Commerce's comments are
not the post hoc rationalization of its counsel.").

59,934 (Dep't Commerce Sept. 11, 1980) (results of admin. review of antidumping

finding) (finding merchandise transshipped through an intermediate country subject to

antidumping duties "unless the merchandise has undergone substantial transformation

or reprocessing which results in a product with a new character or use").  In this context,

Commerce uses its substantial transformation analysis to determine whether a product

originates in a country covered by an antidumping duty order and is, thus, within the

"class or kind of foreign merchandise" subject to antidumping duties pursuant to 19

U.S.C. § 1673(1).  *E.I. Du Pont de Nemours & Co. v. United States*, 22 CIT 370, 373, 8

F. Supp. 2d 854, 858 (1998).  Venus has not pointed to any Commerce determination

where the agency has used its substantial transformation analysis for any other

purpose.

　　　　In contrast, the *NWR* test may guide Commerce's identification of "the producer

of the subject merchandise when in-scope inputs are used to manufacture subject

merchandise [in the subject country] for purposes of 19 U.S.C §§ 1677b and 1677(28)."

*Venus I*, 424 F. Supp. 3d at 1377.[17]  Venus's insistence that Commerce declined to use

---

[17] In *Venus I*, the court explained the relevance of those provisions to Commerce's
margin calculations:

> An antidumping duty is the amount by which the normal value of a
> product—generally, its price in the exporting country—exceeds the export
> price, as adjusted.  19 U.S.C. § 1673; *see also id.* § 1677b(a)(1)(B)(i)
> (defining normal value).  In certain situations, Commerce calculates
> normal value using the constructed value of the merchandise. *Id.*
> § 1677b(a)(4).
> . . . .
>
> To ascertain constructed value, Commerce typically requires information
> from both the producer and the exporter of the subject merchandise.  *See
> id.* § 1677(28); Uruguay Round Agreements Act, Statement of

the substantial transformation test because its input and output products (i.e., SS

rounds and SS bar) are in the same class or kind of merchandise is incorrect.  *See,*

*e.g.*, Pls.' Opp'n Cmts. at 3.  Rather, because country of origin was not at issue, the

absence of a class or kind demarcation led Commerce to use the *NWR* test to identify

the producer of the subject merchandise; but when such demarcation is present,

Commerce would conclude that the producer of the output is the producer for the

relevant statutory purpose.  Remand Results at 15, 16 (referring to a change in class or

kind of merchandise under those circumstances as "dispositive"); *cf.* Final Analysis

Mem. at 4 (summarily concluding that Venus is the producer of SS bar made from SS

wire rod).

It is well-settled that the court may not "substitute its judgment for that of the

agency regarding which methodology is best suited to [the task at hand]," absent

"demonstrated unreasonableness of the agency's chosen methodology."  *Gold East*

*Paper (Jiangsu) Co., Ltd. v. United States*, 35 CIT ___, ___, 121 F. Supp. 3d 1304,

1312 (2015).  This is true even if "the court would justifiably have made a different

choice had the matter been before it *de novo*."  *Universal Camera Corp. v. N.L.R.B.*,

340 U.S. 474, 488 (1951); *see also Suramerica de Aleaciones Laminadas, C.A. v.*

_____

Administrative Action, H.R. Doc. No. 103–316, vol.1, at 835 (1994),
reprinted in 1994 U.S.C.C.A.N. 4040, 4172 ("SAA") ("[When] different
firms perform the production and selling functions, Commerce may include
the costs, expenses, and profits of each firm in calculating cost of
production and constructed value.").  Consequently, Commerce must
identify the producer of the subject merchandise in order to obtain the
information necessary to calculate the cost of production and constructed
value.  I&D Mem. at 11.
424 F. Supp. 3d at 1374 (footnote omitted).

*United States*, 966 F.2d 660, 665 (Fed. Cir. 1992) (in matters of statutory interpretation,

the court's review is limited to determining whether the agency's construction is

permissible; "[w]hether [the court] would come to the same conclusion, were [it] to

analyze the statute anew, is not the issue").

 To that end, Venus does not argue that the *NWR* test is inherently unreasonable;

rather, Venus suggests that it produced an unreasonable result that is inconsistent with

Commerce's determinations in the SSWR/SSB Scope Rulings.  *See* Pls.' Opp'n Cmts.

at 8–10.  According to Venus, Commerce's assertion that the SSWR/SSB Scope

Rulings turned on class or kind distinctions represents an effort to avoid engaging in an

analysis of whether the conversion of SS rounds into SS bar constitutes a substantial

transformation.  *Id.* at 8–9.

 In the UAE SSWR Scope Ruling, Commerce reasoned that the cold-working

process performed on the SS wire rod changed the physical characteristics Commerce

"considers in determining a class or kind of merchandise," with the exception of grade.

UAE SSWR Scope Ruling at 12; *see also id.* (finding that "[t]he production process . . .

transforms the input from one class or kind of merchandise," SS wire rod, "into another,"

SS bar).  Commerce relied on this finding in subsequent scope rulings.  *See* Spain Final

SSWR Scope Ruling at 23–25; Spain Final SSB Scope Ruling at 24–25.  Thus,

although Commerce discussed the processing necessary to transform SS wire rod into

SS bar, it did so in the context of examining whether the input and output products were

distinct articles governed by separate orders.  *See* UAE SSWR Scope Ruling at 11–12

(noting that Commerce and the U.S. International Trade Commission "have consistently

held" that SS bar and SS wire rod "are separate and distinct products[]" and therefore

concluding that the SS wire rod input and SS bar output at issue were "covered by the

scope language of separate [antidumping duty] and [countervailing duty] orders"); Spain

Final SSB Scope Ruling at 25.  After concluding that they were distinct products

covered by separate orders, Commerce determined the country of origin of the SS bar

based on where the change in class or kind of merchandise occurred.  *See* Spain Final

SSB Scope Ruling at 25–26 (adhering to prior scope rulings that identified country of

origin based on where the conversion of SS wire rod into SS bar occurred).

    Thus, notwithstanding certain factual similarities between the conversion of SS

wire rod into SS bar and the conversion of SS rounds into SS bar, Commerce's analysis

in the SSWR/SSB Scope Rulings is not directly applicable to this case given the

physical differences between the starting inputs and the inclusion of SS rounds in the

same class or kind of merchandise as SS bar.  *See* Remand Results at 6 & n.20

(explaining that SS wire rod is coiled whereas SS bar (which includes SS rounds) is

formed into straight lengths) (citing UAE SSWR Scope Ruling at 13).  In the SSWR/SSB

Scope Rulings, Commerce directed its analysis to whether there was a change in the

class or kind of merchandise because that is a factor in the substantial transformation

test and the input in question there was a distinct class or kind of merchandise from the

output.  *See supra* note 9.  Even if Commerce applied its substantial transformation test

here, it would not find such a change in the class or kind of merchandise and would

need to consider the remaining factors.  *See, e.g.*, Remand Results at 14.  The court

cannot—and need not—speculate as to the results of that analysis.  In sum,

Commerce's determination is not undermined by the SSWR/SSB Scope Rulings.

The question presented in this case is whether—pursuant to *Chevron* prong

two—Commerce's use of the *NWR* test to identify the producer of the subject

merchandise was a permissible method of carrying out its statutory obligations.  *See*

*Apex Frozen Foods*, 862 F.3d at 1344; *Pesquera Mares Australes*, 266 F.3d at 1379–

82.  As part of that inquiry, the court directed Commerce to address "why the substantial

transformation test is irrelevant under the circumstances presented by this case."

*Venus I*, 424 F. Supp. 3d at 1380.  While the court discerns Commerce's rationale for

selecting the *NWR* test in this case, Commerce has not fully answered the question

such that it may disregard the substantial transformation test in *all* instances when

country of origin is not at issue (though different circumstances may require Commerce

to do so).  Whether the *NWR* test or substantial transformation test (or some other

analytical framework) is best suited to the task at hand may depend, at least in part, on

the breadth of the scope of the subject merchandise at issue.[18]

---

[18] While Commerce relies on class or kind demarcations (or lack thereof) to guide its
analytical approach when country of origin is not at issue, Remand Results at 14–15,
such demarcations are not carved in stone.  Class or kind distinctions derive from
Commerce's scope language, which, in turn, is derived at least in part from the
underlying petition and the wishes of the petitioner(s).  *See Duferco Steel, Inc. v. United
States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002) (explaining that "[t]he purpose of the
petition is to propose an investigation" into a particular product, and "[a] purpose of the
investigation is to determine what merchandise should be included in the final order,"
i.e., within the scope of that order).  A product that is outside of a particular scope may
nevertheless bear substantial similarities to a product that is in-scope.  Indeed, a
product regarded as distinct and, therefore, excluded from one or more investigations
may be included within the scope of a subsequent investigation.  *See Hitachi Metals,*

Although Commerce seeks to distinguish other proceedings, such as *DSBs From China*, on the basis that country of origin was at issue, an equally pertinent distinction may be found in the language of the underlying scope.  In that proceeding, the scope of the antidumping duty order covered, *inter alia*, "all finished circular sawblades . . . *and parts thereof*."  *Diamond Sawblades and Parts Thereof From the People's Republic of China and the Republic of Korea*, 74 Fed. Reg. 57,145, 57,145 (Dep't Commerce Nov. 4, 2009) (antidumping duty orders) (emphasis added); *see also Microdisks From Japan*, 54 Fed. Reg. at 6,434 (in which the scope of the investigation covered "3.5″ microdisks and coated media thereof").  While it is beyond the purview of this litigation, Commerce may need to do more to justify its use of the *NWR* test over the substantial transformation test to ascertain the producer of the finished product when parts are sourced from and assembled within the subject country in a case in which the scope encompasses a finished product "and parts thereof."  In contrast, here, where the scope is limited to the finished product, Commerce reasonably relied on the *NWR* test.  In sum, the court will sustain Commerce's decision, as articulated in the Remand Results, to use the *NWR* test in this case.  The court now turns to Venus's remaining challenges to the *Final Results*.

---

*Ltd. v. United States*, 42 CIT ___, ___, 350 F. Supp. 3d 1325, 1334–39 (2018), *aff'd*, 949 F.3d 710 (Fed. Cir. 2020).  Thus, if Commerce wishes to rely on the significance of class or kind distinctions, it must ensure a level of discipline in establishing the parameters of any given class or kind.

**II. Venus's Challenges to Commerce's Application of the *NWR* Test**

**A. Parties' Contentions**

Venus contends that Commerce's *NWR* analysis ignored that (1) "the physical and mechanical properties of a metal product can be drastically altered without adding new materials, such as through reheating and straightening," and (2) Venus's production processes consume other inputs, such as "power, fuel, labor, lubricants and grinding wheels."  Pls.' Mem. at 14; *see also* Confidential [Venus's] Reply Br. in Supp. of their Rule 56.2 Mot. For J. on the Agency R. ("Pls.' Reply") at 1–2, ECF No. 44.  Venus further contends that Commerce failed to address adequately Venus's argument that its processing changed proportionally more product characteristics than occurred in *NWR* because the agency "merely bootstrap[ped] its decision" to the fact that Venus adds no additional materials.  Pls.' Mem. at 15.[19]

The Government and Defendant-Intervenors contend that Commerce's determination pursuant to the *NWR* test is supported by substantial evidence.  *See* Def.'s Resp. at 15–17; Confidential Def.-Ints.' Resp. in Opp'n to Pls.' Mot. for J. on the Agency R. ("Def.-Ints.' Resp.") at 14–16, ECF No. 42.  Defendant-Intervenors further contend that Venus offers no support for its argument that the number of changed characteristics "[is] determinative with respect to further manufacturing."  Def.-Ints.' Resp. at 15.

---

[19] Venus also argues that Commerce's use of the *NWR* test has not risen to the level of agency practice and, thus, Commerce was not bound to use it.  Pls.' Mem. at 15.  Assuming that is true, the question presented in this case is whether Commerce permissibly relied on the *NWR* test, not whether Commerce had to rely on the *NWR* test, and whether the agency's findings are supported by substantial evidence.

**B. Commerce's Findings Pursuant to the *NWR* Test are Supported by Substantial Evidence**

In its preliminary decision memorandum, Commerce detailed its findings with respect to the application of the *NWR* test; that is, Commerce considered whether Venus added new materials and the number of essential physical characteristics altered by Venus's processing.  Prelim. Mem. at 7.  Thereafter, Venus filed a case brief in which it argued, *inter alia*, that Commerce's analysis and findings with respect to the substantial transformation of SS wire rod into SS bar must inform the agency's determination here because its cold working processes are "nearly identical" to those at issue in the Spain Final SSB Scope Ruling.  Admin. Case Br. of Venus Wire Industries Pvt. Ltd. (Jan. 9, 2018) ("Venus's Case Br.") at 7–9, CR 324, PR 407, CJA Tab 25; *see also id.* at 8 (summarizing certain changes to the hot rolled input as a result of its cold finishing operation).  As discussed, Commerce disagreed with Venus regarding the relevance of the SSWR/SSB Scope Rulings.  I&D Mem. at 13–14; Remand Results at 5–7.

Before the court, Venus seeks to reframe its argument as one that challenges the parameters of the *NWR* test.  That is, separate and apart from its arguments regarding the applicability of the SSWR/SSB Scope Rulings, Venus now argues that Commerce should have considered changes to "physical and mechanical properties" beyond the physical characteristics Commerce considered "essential."  *See* Pls.' Mem. at 14.  As noted, Venus did not squarely present this argument to the agency.  *See* Venus's Case Br. at 7–9.  Venus further acknowledged at oral argument that it failed to urge the

Court No. 18-00113                                                    Page 24

agency to account for the consumption of other inputs in its analysis.  *See* Oral Arg. at

11:22:30–11:23:40 (reflecting the time stamp from the recording).

"[T]he Court of International Trade shall, where appropriate, require the

exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  While exhaustion is not

jurisdictional, *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353,

1363–64 (Fed. Cir. 2019), the statute "indicates a congressional intent that, absent a

strong contrary reason, the [CIT] should insist that parties exhaust their remedies before

the pertinent administrative agencies," *id*. at 1362 (quoting *Boomerang Tube LLC v.

United States*, 856 F.3d 908, 912 (Fed. Cir. 2017)) (alteration original) (emphasis

added).  The doctrine of administrative exhaustion generally requires a party to present

"all arguments" in its administrative case brief before raising those issues before this

court.  19 C.F.R. § 351.309(c)–(d); *see also Dorbest Ltd v. United States*, 604 F.3d

1363, 1375 (Fed. Cir. 2010).  This permits the agency to address the issue in the first

instance, prior to judicial review.  *See Boomerang*, 856 F.3d at 912–13.

Because Venus did not present to Commerce these arguments regarding the

relevance of additional metallurgical changes to the SS rounds or the consumption of

other inputs for determining whether Venus is the producer, there is no corresponding

agency decision for the court to review.  Rather, Venus essentially requests the court to

reconsider the agency's decision in light of these additional facts and belated

arguments, which it cannot do.  *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376–77 (Fed. Cir. 2015).[20]

Further, while Venus takes issue with Commerce's reliance on the absence of new materials to tip the balance in favor of finding that Venus is not the producer, Pls.' Mem. at 15, this fact, in conjunction with the fact that three out of six essential physical characteristics remained unchanged by Venus's processing, constitutes substantial evidence supporting Commerce's determination, *see* I&D Mem. at 12 & nn.44–45 (citations omitted); *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) ("Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Consol. Edison Co. v. NLRB.*, 305 U.S. 197, 229 (1938)).  While Venus may disagree with Commerce's conclusion, "mere disagreement with Commerce's weighing of the evidence[] . . . mistakes the function of the court, which is to determine whether the Remand Results are supported by substantial evidence, . . . not to 'reweigh the evidence or . . .

---

[20] In its reply, Venus attempts to rebut an argument purportedly made by the Government that an exporter must change a majority of the essential physical characteristics for Commerce to find that the exporter is the producer.  *See* Pls.' Reply at 3–4.  The Government merely observed, however, that "[b]ecause [Venus's] processing did not add any materials to the purchased input, it did not alter a majority of the essential physical characteristics of the input."  Def.'s Resp. at 15.  The Government did not apply a bright line rule requiring changes to a majority of the essential physical characteristics for the exporter to be considered the producer pursuant to the *NWR* test—and, more importantly, neither did Commerce.  *See* I&D Mem. at 13 ("[O]ur analysis is based on a totality of the circumstances.").  Moreover, Venus's arguments that its processing altered a majority of the four essential physical characteristics that are susceptible to change, and that the two essential physical characteristics that cannot change "should be less relevant to the [agency's] analysis," Pls.' Reply at 3, are foreclosed because of Venus's failure to administratively exhaust these arguments before Commerce, 28 U.S.C. § 2637(d); 19 C.F.R. § 351.309(c)–(d).

reconsider questions of fact anew.'"  *Haixing Jingmei Chemical Products Sales Co. v.
United States*, 42 CIT ___, ___, 335 F. Supp. 3d 1330, 1346 (2018) (quoting *Downhole
Pipe*, 776 F.3d at 1377) (internal citation omitted).  Accordingly, Commerce's
determination that Venus is not the producer of the subject merchandise, and
corresponding determination that Venus's unaffiliated suppliers of SS rounds are the
producers, is supported by substantial evidence and accords with the law.

## III. Commerce's Use of Total AFA

### A. Parties' Contentions

Venus contends that Commerce erred in applying total AFA because the
company "attempted all reasonable steps to induce its unaffiliated suppliers to provide
[Venus] with the requested cost data."  Pls.' Mem. at 18.  Venus further contends that
Commerce improperly applied the *Mueller* court's analysis by failing to make three key
findings, that: (1) Venus "had sufficient control over its unaffiliated suppliers such that
[Venus] could induce their cooperation," *id.* at 23; (2) Venus's unaffiliated suppliers
could "evade a higher [antidumping] margin by using [Venus] as an exporter," *id.*; or (3)
use of total AFA to determine Venus's margin "would directly and adversely affect its
non-cooperating unaffiliated suppliers' interests," *id.* at 23–24.  In sum, according to
Venus, Commerce's determination lacks "any case-specific analysis of the relationships
between [Venus] and its unaffiliated suppliers," which relationships are marked "by
competition in various markets or constituted a small portion of the suppliers['] sales
[such] that [Venus] lacked the leverage needed to induce their cooperation."  *Id.* at 24.

With respect to the reporting of its inputs, Venus contends that it used terminology generally accepted in the industry to refer to inputs of SS black bar in its initial questionnaire responses. *Id.* at 25. Consequently, Venus contends that it was not until Commerce's third supplemental questionnaire that the agency requested Venus "to identify whether its inputs were subject merchandise," at which time Venus responded. Pls.' Reply at 15.

The Government and Defendant-Intervenors contend that Venus failed to demonstrate that it lacked leverage over its unaffiliated suppliers. Def.'s Resp. at 25; Def.-Ints.' Resp. at 21. According to the Government, Venus "had a mechanism to induce cooperation" from the suppliers, "namely, the threat of no longer purchasing inputs from those suppliers unless" they provided the requested cost information, Def.'s Resp. at 26, and Commerce reasonably determined that Venus's warnings were insufficient, *id.* at 27; *see also* Def.-Ints.' Resp. at 21–22. Defendant-Intervenors further contend that Commerce properly used total AFA in order to prevent Venus "and its suppliers [from] collud[ing] with each other to evade antidumping duties by selling its goods through an Indian company with no dumping margin." Def.-Ints.' Resp. at 23.

With respect to Venus's reporting of its inputs, Defendant-Intervenors contend that Venus obfuscated its purchase of subject raw materials when it used different terms for the same input and failed to inform Commerce that it purchased subject merchandise from unaffiliated suppliers. *Id*. at 23–24 & n.15 ("[I]t is well established that . . . the burden falls on the interested party to place relevant information within its

possession on the record.") (quoting *Yama Ribbons and Bows Co. v. United States*, 36

CIT 1250, 1254, 865 F. Supp. 2d 1294, 1299 (2012)).[21]

### B. Legal Framework

When "necessary information is not available on the record," or an interested

party "withholds information" requested by Commerce," "fails to provide" requested

information by the submission deadlines, "significantly impedes a proceeding," or

provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i),

Commerce "shall ... use the facts otherwise available." 19 U.S.C. § 1677e(a).[22]

Additionally, if Commerce determines that a party "has failed to cooperate by not

acting to the best of its ability to comply with a request for information," it "may use an

inference that is adverse to the interests of that party in selecting from among the facts

otherwise available." *Id.* § 1677e(b). "Compliance with the 'best of its ability' standard

is determined by assessing whether a respondent has put forth its maximum effort to

provide Commerce with full and complete answers to all inquiries in an

investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir.

2003).

Commerce uses total AFA when it must fill gaps in the record not only in

reference "to the facts pertaining to specific sales or information," but in reference "to

---

[21] Although the Government asserts that Commerce "reasonably" concluded that an
adverse inference was merited in relation to Venus's reporting of its inputs, Def.'s Resp.
at 19, it does not present arguments supporting its characterization, *id.* at 22–28.
[22] Commerce's authority to use the facts otherwise available is subject to 19 U.S.C.
§ 1677m(d). *See* 19 U.S.C. § 1677e(a). Section 1677m(d) provides the procedures
Commerce must follow when a party files a deficient submission and is not at issue
here. *See id.* § 1677m(d).

the facts respecting all of [a respondent's] production and sales information that the

[agency] concludes is needed for an investigation or review." *Nat'l Nail Corp. v. United*

*States*, 43 CIT ___, ___, 390 F. Supp. 3d 1356, 1357 (2019) (citation omitted).  In other

words, Commerce generally uses total adverse facts available when "none of the

reported data is reliable or usable."  *Zhejiang DunAn Hetian Metal Co., Ltd. v. United*

*States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (citation omitted).

### C. Commerce's Decision to Use Total AFA Will be Remanded for the Agency's Reconsideration

As discussed above, when Commerce is missing crucial data (such as the cost

of production data at issue here), it turns to its statutory authority to use the "facts

otherwise available" or "adverse facts available," as appropriate.  19 U.S.C. § 1677e.

"Subsection 1677e(a) . . . may be used whether or not any party has failed to cooperate

fully with the agency in its inquiry."  *Mueller*, 753 F.3d at 1232.  In contrast, subsection

1677e(b) permits Commerce to make an inference adverse to an interested party when

it "makes the separate determination that [the party] has failed to cooperate by not

acting to the best of its ability."  *Id.* (quoting *Nippon Steel,* 337 F.3d at 1381).  Here,

Commerce determined that Venus and certain of its unaffiliated suppliers failed to

cooperate to the best of their abilities and used its authority pursuant to subsection

1677e(b) to select an adverse rate.  I&D Mem. at 16–17.  With respect to Venus,

Commerce offered two rationales for using total AFA: Venus's failure to cooperate to the

best of its ability in obtaining cost information from its unaffiliated suppliers and Venus's

failure to identify its inputs of SS rounds until responding to Commerce's third

supplemental questionnaire.  *Id.*; Final Analysis Mem. at 3.  The court addresses each

rationale, in turn.

### 1.  Failure to Obtain Cost Information from Unaffiliated Suppliers

With respect to Venus's failure to obtain cost information from its unaffiliated

suppliers, Commerce relied on the Federal Circuit's *Mueller* decision as the basis for its

finding.  I&D Mem. at 16 & n.65 (citing *Mueller*, 753 F.3d at 1233); Final Analysis Mem.

at 3 & n.17 (citing same).  *Mueller* concerned a cooperating mandatory respondent,

Mueller Comercial de Mexico, S. de R.L. de C.V. ("Mueller"), which exported subject

merchandise purchased from two suppliers, Tuberia Nacional, S.A. de C.V. ("TUNA")

and Ternium Mexico, S.A. de C.V. ("Ternium"), both of which were also mandatory

respondents.  753 F.3d at 1229.  To calculate Mueller's cost of production, Commerce

requested information from TUNA and Ternium.  *Id.* at 1230.  While TUNA reported its

cost information, Ternium did not.  *Id.*  Commerce rescinded its review of TUNA owing

to the absence of direct shipments and assigned Ternium a dumping margin based on

AFA of 48.33 percent due to Ternium's failure to cooperate in the administrative review.

*Id.* at 1229.  In order to calculate Mueller's margin, Commerce used its authority

pursuant to 19 U.S.C. § 1677e(a) to rely on the facts otherwise available.  *Id.*; *see also*

*Canadian Solar Int'l Ltd. v. United States* ("*Canadian Solar I*"), 43 CIT ___, ___, 378 F.

Supp. 3d 1292, 1316–18 (2019) (discussing *Mueller*).  In selecting from among the facts

otherwise available, Commerce identified the three most heavily discounted sales

transactions between TUNA and Mueller and inferred that all transactions between

Ternium and Mueller reflected that discount.  *Mueller*, 753 F.3d at 1230.  Commerce's

use of this adverse inference resulted in a higher dumping margin for Mueller.  *Id.*

Commerce supported its use of an adverse inference based, in part, on its

finding that "Mueller could and should have induced Ternium's cooperation by refusing

to do business with Ternium, and Ternium would not be sufficiently deterred if Mueller

were unaffected by Ternium's non-cooperation . . . [because] Ternium could otherwise

evade its antidumping rate by funneling its goods through Mueller."  *Id.* at 1233.[23]  The

Federal Circuit held that Commerce may rely on inducement and evasion rationales to

calculate a margin for a cooperating party when "the application of those policies is

reasonable on the particular facts and the predominant interest in accuracy is properly

taken into account."  *Id.*

With respect to the inducement rationale, the appellate court noted that "Mueller

had an existing relationship with supplier Ternium" and, thus, "could potentially have

refused to do business with Ternium in the future as a tactic to force Ternium to

cooperate."  *Id.* at 1235.  The court cautioned, however, that when a "cooperating entity

has no control over the non-cooperating suppliers, a resulting adverse inference is

potentially unfair to the cooperating party."  *Id*. (citing *SKF USA Inc. v. United*

*States,* 630 F.3d 1365, 1375 (Fed. Cir. 2011)).  With respect to the evasion rationale,

the court noted "the possibility that Ternium could evade its own AFA rate of 48.33

---

[23] Commerce also found that "the use of the adverse inference to calculate Ternium's
surrogate production cost actually yielded the most accurate calculation of Mueller's
antidumping rate."  *Mueller*, 753 F.3d at 1232.  The Federal Circuit rejected this
rationale as unsupported by substantial evidence and, thus, remanded the matter to the
agency.  *Id.* at 1232–33.

percent by exporting its goods through Mueller if Mueller were assigned a favorable

dumping rate." *Id.*

Although *Mueller* addressed Commerce's authority to use the facts otherwise

available pursuant to subsection 1677e(a), *id.* at 1230,[24] the appellate court found that

subsection 1677e(a) allowed Commerce to take into account policy considerations

typically reserved to subsection 1677e(b), *id.* at 1234 ("The statute on its face does not

preclude Commerce from relying on the same considerations under subsection (a) for

an AFA determination as used under subsection (b)."). Accordingly, even though

discussed in connection with subsection 1677e(a), Commerce may adopt *Mueller*'s

inducement and evasion rationales when acting pursuant to its authority in subsection

1677e(b). Regardless, in this case, Commerce's decision to use total AFA requires

reconsideration by the agency.

For its conclusion that Venus failed to act to the best of its ability to obtain its

unaffiliated suppliers' cost information,[25] Commerce relied on its subsidiary finding that

---

[24] Commerce necessarily relied on subsection 1677e(a) because Mueller was a
cooperating respondent. *See Mueller*, 753 F.3d at 1232. The statute does not permit
Commerce to use "an adverse inference against a cooperative respondent under
subsection 1677e(b)." *Canadian Solar I*, 378 F. Supp. 3d at 1319; *see also* 19 U.S.C.
§ 1677e(b)(1)(A) (permitting Commerce to use an inference adverse to the interests of
the party that "failed to cooperate by not acting to the best of its ability to comply with a
request for information").

[25] Commerce's reliance on *Mueller* to find that Venus failed to cooperate to the best of
its ability sets this case apart from others where Commerce has faulted a mandatory
respondent's suppliers for failing to cooperate but otherwise treated the respondent as a
cooperating party. *Cf. Canadian Solar Int'l Ltd. v. United States* ("*Canadian Solar II*"),
43 CIT ___, ___, 415 F. Supp. 3d 1326, 1332– 35 & n.13 (2019) (remanding
Commerce's use of an inference adverse to the interests of a cooperative respondent,
this time pursuant to subsection 1677e(a), as lacking "[t]he accuracy analysis required

Venus's emails to its suppliers "did not serve as a strong inducement to cooperate."

Final Analysis Mem. at 3.[26]  However, Commerce's reliance on *Mueller*'s observation

that the existence of a buyer-seller relationship means that an exporter could potentially

refuse to do business with its supplier to induce cooperation placed undue emphasis on

Venus's warnings to its suppliers, thereby truncating the *Mueller* analysis and leading

the agency to disregard relevant record evidence.  Final Analysis Mem. at 3; *Mueller*,

753 F.3d at 1235.  Thus, as discussed below, Commerce's determination is

unsupported by substantial evidence and not in accordance with the law.

     To begin with, Commerce created an arbitrary linguistic line when it measured

Venus's degree of cooperation based on Venus's use of a certain word in its emails to

unaffiliated suppliers.  *See* Final Analysis Mem. at 3.[27]  While Commerce clearly permits

some equivocation by a respondent in its attempts to induce cooperation, *see id.*, the

---

by *Mueller*" and substantial evidence supporting the use of inducement/evasion
rationales); *Xiping Opeck Food Co. v. United States*, 41 CIT ___, ___, 222 F. Supp. 3d
1141, 1157 (2017) (affirming Commerce's decision, on remand, to apply an AFA rate to
a cooperative respondent when the agency further explained its determination and
pointed to substantial evidence supporting its reliance on inducement/evasion
rationales); *Itochu Building Prods. Co. v. United States*, Slip Op. 17-73, 2017 WL
2703810, at *16 (CIT June 22, 2017) (remanding Commerce's use of an inference
adverse to the interests of a cooperative respondent when the agency failed to "conduct
the necessary case-specific analysis to determine whether it was appropriate to apply
an adverse inference to [the respondent] for its supplier's failure to cooperate").
[26] Specifically, Commerce explained that Venus's emails "only [[
                                                                        ]]."  Final Analysis
Mem. at 3.
[27] Commerce found that Venus's use of the word "[[    ]]" in relation to the possibility
that Venus would "[[                                                        ]]" did not
represent "a strong inducement to cooperate," whereas language indicating a "[[
        ]]"   of "[[                            ]]" would have sufficed.  Final Analysis Mem. at 3.

agency has not provided any explanation supporting the distinction it seeks to draw in this case.

Further, while *Mueller* recognizes that an unwillingness to export goods produced by an uncooperative supplier "would potentially induce [the supplier] to cooperate," the appellate court also stated that "if the [respondent] has no control over the non-cooperating suppliers, a resulting adverse inference is potentially unfair to the [respondent]." *Mueller*, 753 F.3d at 1235 (citing *SKF*, 630 F.3d at 1375).[28]  The concept of "control," as discussed in *Mueller,* does not require actual control, but, instead, it requires Commerce to consider record evidence concerning the practical ability of a respondent to induce the supplier's cooperation.  753 F.3d at 1235; *cf. Xiping*, 222 F. Supp. 3d at 1158 (sustaining Commerce's determination that an exporter could induce a downstream purchaser's cooperation when the record demonstrated that the purchaser was not able to use a different supplier due to the "nature of their relationship" and the exporter's market dominance).[29]

---

[28] The *SKF* court sustained Commerce's authority to use unaffiliated supplier data to calculate constructed value rather than a respondent's acquisition costs.  630 F.3d at 1372–75.  However, the court remanded the determination for Commerce to address the respondent's concern that the agency may ultimately apply an adverse inference if the suppliers failed to provide their cost information, noting that the "[u]se of adverse inferences may be unfair considering [the respondent] has no control over its unaffiliated supplier's actions."  *Id.* at 1375.

[29] While *Mueller* cautions that an adverse inference pursuant to subsection 1677e(a) could be unfair to a *cooperating* entity when that entity lacks control over an unaffiliated supplier, 753 F.3d at 1235, Commerce's invocation of subsection 1677e(b) does not absolve the agency from addressing record evidence concerning Venus's practical ability to obtain its suppliers' cooperation as part of its consideration whether Venus acted to the best of its ability.  Setting aside the issue of fairness, in the context of unaffiliated entities, the concepts of inducement and control overlap.  Commerce may

Here, Commerce did not adequately consider evidence tending to show that Venus's efforts to induce cooperation failed, at least in part, because of circumstances beyond Venus's control; *to wit*, the suppliers' own concerns that providing the cost information did not serve the suppliers' respective interests. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); Venus 4th Suppl. DQR, Ex. 1.[30]  Moreover, Commerce failed to point to any evidence indicating that Venus could induce its unaffiliated suppliers' cooperation. *Cf. Canadian Solar II*, 415 F. Supp.

---

not, therefore, limit its inquiry to the precise steps Venus took without considering the circumstances under which those steps were taken.  In other words, Commerce may not rely on *Mueller*'s inducement rationale without considering whether a respondent may, in fact, be able to induce an unaffiliated supplier's cooperation.

[30] As noted, only one of Venus's [[     ]] unaffiliated suppliers of SS rounds provided Commerce with its cost information.  Venus 4th Suppl. DQR at 1.  The remaining [[     ]] gave various reasons for their reticence.  Venus's largest supplier, [[                  ]], stated that assisting Venus "[[

                              ]]" because [[          ]] and Venus compete in various markets.  *Id.*, Ex. 1 at ECF pp. 530–31.  The company further averred that its [[

                                                                              ]] prevented it from cooperating.  *Id.*, Ex. 1 at ECF p. 531.  Venus's second largest supplier, [[          ]], explained that its "[[

                                    ]]."  *Id.*, Ex. 1 at ECF p. 539.  According to [[              ]], the company "[[

              ]]."  *Id.*  While Venus explained that [[

                                                                              ]], the company did not supply the requested information.  *See id.*, Ex. 1 at ECF p. 540.  Venus's third largest supplier, [[                        ]], expressed concern that [[

                                          ]].  *Id.*, Ex. 1 at ECF p. 555.  Venus attempted to alleviate that concern, *see id.*, Ex. 1 at ECF pp. 551–52, and it appeared that [[                  ]] might cooperate, *id.*, Ex. 1 at ECF p. 551.  However, [[              ]] also indicated its preference that [[                                              ]], *id.*, Ex. 1 at ECF p. 551, and ultimately did not submit the requested information.

3d at 1334 (rejecting Commerce's reliance on a respondent's "market presence, continued growth, and supplier-specific accounts, to substantiate its claim that [the respondent] could have induced its suppliers' cooperation" because "[s]uch facts do not reasonably indicate the presence of a long-term relationship creating leverage") (second alteration in original) (citation omitted).  Instead, Commerce appeared to assume that Venus had leverage over its unaffiliated suppliers and simply failed to properly apply it.[31]  Commerce's reasoning is inconsistent with *Mueller*, which recognizes the possibility of inducing cooperation, but not the certainty.  753 F.3d at 1235 (observing that "if Mueller and other entities were not willing to export goods produced by Ternium, this would *potentially* induce Ternium to cooperate") (emphasis added).

In addition, while *Mueller* does not require Commerce to consider inducement and evasion rationales in tandem, record evidence demonstrating that an unaffiliated supplier is not evading its own antidumping rate by supplying subject merchandise to an exporter with a lower rate is relevant to whether an exporter may reasonably be able to induce cooperation from that supplier.  753 F.3d at 1234–35 (approving "Commerce's use of an evasion *or* inducement rationale") (emphasis added); *cf. Xiping*, 222 F. Supp.

---

[31] Commerce opined that Venus should have "ensure[d] that it would have [the suppliers'] full cooperation in any antidumping proceeding with Commerce" before purchasing from them.  Final Analysis Mem. at 3.  However, in the eight administrative reviews that Commerce previously conducted of Venus, Commerce treated Venus as the producer of the subject merchandise.  *See* I&D Mem. at 12–13 (nevertheless rejecting Venus's argument based on prior reviews in part because Venus's status as producer was never disputed in those reviews).  Moreover, for several years preceding the instant review, Venus was nominally not subject to the *SS Bar Order* due to its partial revocation in 2011.  *Revocation Finding*, 76 Fed. Reg. at 56,403.  Thus, Venus could not have known that it would need the suppliers' cost information when it purchased the SS rounds that it converted into the SS bar subject to this review.

3d at 1158–59 (sustaining Commerce's determination that the respondent "was in a

position to induce [the] cooperation" of a noncooperating downstream purchaser of

subject merchandise because the noncooperating company "was not in a position to

evade a dumping margin assigned to [the respondent] by sourcing from a different

supplier").

Here, record evidence suggests that Venus's ability to induce cooperation from

its largest supplier was unsupported by any need for that company to evade its own

higher dumping margin.  Final Analysis Mem. at 2;[32] *cf. Mueller*, 753 F.3d at 1235

(noting the "possibility that Ternium could evade its own AFA rate of 48.33 percent by

exporting its goods through Mueller if Mueller were assigned a favorable dumping rate").

Commerce failed to account for this evidence that fairly detracted from its determination

that Venus "could have done more to induce its suppliers to cooperate."  Final Analysis

Mem. at 3.[33]

---

[32] At the time of the changed circumstances review, [[              ]] had a [[      ]] percent
dumping margin.  Final Analysis Mem. at 2.  Commerce indicated that [[              ]] and
[[              ]] would potentially be subject to [[              ]] dumping margins.  *Id.*
However, the degree to which those companies would benefit from Commerce's
calculation of a company-specific margin for Venus, such that they would be tempted to
evade their own margins, is unclear given that Commerce has not calculated a
company-specific margin for Venus based on its suppliers' cost information.

[33] Because Commerce did not consider or rely on an evasion rationale, Defendant-
Intervenors' argument that Commerce properly used total AFA in order to prevent
Venus and its suppliers from colluding with each other to evade the imposition of
antidumping duties amounts to impermissible "*post hoc* rationalization[] for agency
action."  *Burlington*, 371 U.S. at 168–69 (the court may only sustain the agency's
decision "on the same basis articulated in the order by the agency itself").

In sum, Commerce's determination that Venus failed to act to the best of its ability to obtain its unaffiliated suppliers' cost information is unsupported by substantial evidence and otherwise not in accordance with law.[34]

### 2. Venus's Reporting of its Subject Inputs

As discussed, in order to use an adverse inference, Commerce must find that "an interested party has failed to cooperate by not acting to the best of its ability to comply *with a request for information* from the [agency]." 19 U.S.C. § 1677e(b)(1) (emphasis added). Commerce's finding that Venus "failed to clearly identify that it purchase[d] SS bar as an input until directly asked in the third supplemental questionnaire" presupposes that Venus had the obligation to do so. However, "[t]o avoid the threat of [section] 1677e(b), a submitter need only provide complete answers to the questions presented in an information request." *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1574 (Fed. Cir. 1990); *see also JSW Steel Ltd. v. United States*, 42 CIT ___, ___, 315

---

[34] Venus relies on *Itochu* to argue that Commerce failed to make the necessary finding that applying an adverse inference to Venus would "directly and adversely affect the non-cooperating supplier's interests." Pls.' Mem. at 21 (citing *Itochu*, 2017 WL 2703810, at *16). In *Mueller*, the Federal Circuit required Commerce to recalculate Mueller's dumping margin using the facts otherwise available pursuant to 19 U.S.C. § 1677e(a) with a "primary objective" of calculating "an accurate rate for Mueller" that nevertheless reflects "policy considerations that motivated the decision under review—namely, [the agency's] desire to encourage Mueller to induce Ternium's cooperation and Commerce's concern that calculating too low a rate for Mueller might allow Ternium to evade its own dumping duty by channeling sales through Mueller." 753 F.3d at 1235–36. Here, however, Commerce relied on subsection 1677e(b)—not subsection 1677e(a)—and *Mueller* does not support the need for Commerce find a direct adverse effect on Venus's noncooperating suppliers in order to draw an adverse inference against Venus.

F. Supp. 3d 1379, 1383 (2018) ("[W]hile Commerce has latitude to request a wide range

of information, it is only entitled to receive what it actually requests.").[35]

Here, although Commerce initially posed various questions to Venus regarding

its raw materials and production processes, at that time, the agency never requested

Venus to state whether any of its inputs consisted of subject merchandise.  *See, e.g.*,

Submission of Resp. to Section A of the Questionnaire in Changed Circumstances

Review ("Venus AQR") at A-24, CR 22, PR 65, CJA Tab. 6; Resp. to Section D of the

Questionnaire (May 18, 2017) ("Venus 2nd Suppl. DQR")  at 12–13, CR 201, PR 260,

Suppl. CJA.  Documentation supplied by Venus suggested that it consumed subject

merchandise as an input, and Commerce requested clarification.  *See* I&D Mem. at 16.

Venus subsequently confirmed that it used subject SS rounds to produce the SS bar

exported to the United States.  *See id*; Resp. to SQR3-Questionnaire (July 10, 2017) at

ECF pp. 476–77, CR 250, PR 307, CJA Tab 15.  Commerce cannot fault Venus for

failing to answer a question before it was requested to do so.  *See, e.g.*, *Olympic*

*Adhesives, Inc.*, 899 F.2d at 1572–75.

Additionally, to the extent that Commerce concluded that Venus failed to act to

the best of its ability by obfuscating its use of subject merchandise, *see* I&D Mem. at 10

---

[35] Commerce asserted that "[t]he onus is on the respondent to build a clear record." I&D Mem. at 10 & n.34 (citing *Yama Ribbons*, 36 CIT at 1254, 865 F. Supp. 2d at 1299); *Peer Bearing Co.-Changshan v. United States*, 32 CIT 1307, 1310, 587 F. Supp. 2d 1319, 1325 (2008)); *cf.* Def.-Ints.' Resp. at 24 n.15 (citation omitted).  While *Yama Ribbons* and *Peer Bearing* support the notion that a respondent bears the burden of providing complete, accurate, and timely responses to Commerce's questionnaires, and cannot later complain about an adverse determination when the respondent withheld beneficial information, neither case suggests that a respondent is required to supply information beyond what Commerce requests in its questionnaires.

(stating that Venus "used multiple terms for the same input"), Commerce has not

explained why the record supports that finding.  The scope of the *SS Bar Order*

explicitly covers "articles of stainless steel in straight length that have been . . . hot-

rolled, . . . having a uniform solid cross-section . . . in the shape of circles, segments of

circles, [and] ovals."  60 Fed. Reg. at 9,661.  Early in the review, Venus described one

of its inputs as "S.S. Rounds – Hot Rolled."  Venus AQR, Annex. A-8.  Commerce does

not explain why the term "rounds[,] bars[,] and rods of stainless steel" that Venus used

in the documentation that alerted Commerce to the possibility that the input was subject

merchandise, *see, e.g.*, Venus 2nd Suppl. DQR, Annex. SQR-85 at ECF p. 304, was

any clearer than the terminology Venus used in its Section A Questionnaire Response.

Moreover, Venus's use of the term "Stainless Steel Black Bars" in the narrative portion

of its Section A Questionnaire Response, Venus AQR at A-24, is consistent with

terminology used in a declaration accompanying Petitioners' request for the changed

circumstances review, Pet'rs' Req. for Changed Circumstances Review (Sept. 29,

2016), CR 1, PR 1, CJA Tab 1; *id.*, Ex. AD-IN-4.A ¶ 3, Suppl. CJA (referring to the

production of SS bar from "black bar").  This consistency suggests that the term "black

bar" is an accepted industry term.  *See* Pls.' Mem. at 24–25.  Thus, in the event that

Commerce continues to rely on an obfuscation rationale, the agency must explain why

the record supports that finding and address the contrary evidence discussed above.

      In sum, Commerce's decision to use an adverse inference on the basis that

Venus did not identify its consumption of subject inputs until requested to do so is

unsupported by substantial evidence.  Accordingly, while the court sustains

Commerce's Remand Results to the extent that they further explain why Commerce determined that Venus was not the producer of the imported SS bar, the court will remand the *Final Results* as amended by the Remand Results for Commerce to reconsider its use of total AFA.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby:

**ORDERED** that Commerce's *Final Results*, as amended by the Remand Results, are remanded to the agency for reconsideration with respect to the agency's use of total AFA consistent with this opinion; it is further

**ORDERED** that Commerce shall file its remand results on or before November 12, 2020; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words.

/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated: August 14, 2020
          New York, New York